(No. 23420— ) 

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* FRANK R. BRAUNE *et al.* Plaintiffs in Error.

*Opinion filed June 10, 1936.*

GRENVILLE BEARDSLEY, for plaintiff in error Frank R. Braune; WM. SCOTT STEWART, for plaintiff in error Maurice L. Dale.

OTTO KERNER, Attorney General, THOMAS J. COURTNEY, State's Attorney, and A. B. DENNIS, (EDWARD E. WILSON, JOHN T. GALLAGHER, RICHARD H. DEVINE, MELVIN REMBE, E. I. HARRINGTON, IRWIN B. CLORFENE, and BENJAMIN NELSON, of counsel,) for the People.

Mr. JUSTICE JONES delivered the opinion of the court:

A writ of error was sued out of this court to the criminal court of Cook county to review a conviction of Frank R. Braune and Maurice L. Dale. The indictment against them contained five counts. A *nolle prosequi* was entered as to the last count. The other four counts charged the defendants committed a criminal abortion on Marie Dwyer, whereby they did kill and murder her. Both defendants were found guilty of manslaughter.

At the outset of the trial a serious error was committed, which substantially affected the rights of both defendants as well as the fairness of the trial. This error was one of law, and we will not make a greater recital of the evidence than is necessary for a proper decision of the case.

The defendants were physicians. Marie Dwyer was a patient of Dr. Dale and also kept company with him. She became pregnant, of which fact she and Dr. Dale became aware during January, 1935. On February 18 she and Dr. Dale went to the office of the defendant Dr. Braune, who made a physical examination of Miss Dwyer. She and Dr. Dale returned to Dr. Braune's office on February 21 and February 22. It is the contention of the People that the abortion was committed on the last mentioned date by Dr. Braune, in the presence and by the procurement of Dr. Dale. During the operation Dr. Braune used forceps for the purpose of removing what he claimed was placental tissue. In doing so the forceps withdrew a loop of intestine or bowel. While holding it fast in the forceps he took scissors and clipped it. Both he and Dr. Dale discovered that the part clipped was intestine. The severed ends were hastily put together and the patient was sent to a hospital and a surgeon was called, who performed an operation to unite the ends of the intestine. The patient died a few days thereafter.

The defendants employed different counsel, and prior to the trial Dr. Braune filed a verified petition for a sever-

ance, in which he set forth in detail his version of all his conduct relating to the alleged crime. He represented that when he made his first examination of Miss Dwyer he found she had been in a pregnant condition about three months, and that from certain physical facts, which are mentioned, he concluded the probabilities were the fœtus was dead; that he prepared the patient for later examination, and it was for that purpose she returned to his office on February 21; that his examination on this date further convinced him that the fœtus was dead and that she was the victim of a "missed abortion;" that he concluded it was necessary to anæsthetize the woman to ascertain what the actual condition was, and if the fœtus was dead it would be necessary to remove the contents of the uterus to avoid serious consequences and risk of losing her life. The petition further set forth with great particularity the details of the operation on February 22, at which time an anæsthesia was administered. It stated that the reason for the emission of the intestine was that the uterus had become so boggy and impaired that it ruptured, admitting into it the intestine, and that the latter was severed before he was aware of the rupture. It was alleged that the general physical condition of Miss Dwyer was greatly depleted, due to a head injury she had previously received, and that she was totally incapacitated to accept any kind of employment. The petition charged that the diseased and impaired condition of her genital organs was due to efforts of Dr. Dale to abort her; that Dale will become a witness in his own behalf and that their defenses will be directly and diametrically conflicting and antagonistic to each other and it would be impossible for him to secure a fair and impartial trial jointly with Dale. This petition was overruled by the court, and thereupon the defendant Dale filed a petition for a separate trial, and alleged he had heard the petition of Braune read in open court concerning the facts and circumstances surrounding the commission of the alleged abor-

tion and that the same are prejudicial to him (Dale) and implicates him in the crime charged; that he is innocent thereof, and denies the truth of the admissions and statements made in Braune's petition which in any manner implicate Dale in the crime, and furthermore, that he is informed that Braune will become a witness in his own behalf and that his testimony will be substantially the same as the statements set forth in his petition for a separate trial; that because they are co-defendants he cannot cross-examine Braune as he would desire to do in view of their antagonistic defenses, and that he cannot obtain a fair and impartial trial if they are tried jointly. At the conclusion of the reading of this petition an assistant State's attorney stated to the court that "the defense here seems to be according to these two counsel—each counsel is going to involve the other doctor. The court by proper instructions can certainly caution the jury." The court denied the motions for severance.

A motion for a severance must set out the grounds showing the reason for granting the severance, (*People* v. *Paisley*, 299 Ill. 576,) and the trial court passes upon the motion upon the grounds advanced at the time it was made. (*People* v. *Hotchkiss*, 347 Ill. 217; *People* v. *Nusbaum*, 326 id. 518.) The People urge that the petitions for separate trials did not state any facts or any theories which disclose that the defenses would be inconsistent. If the recitals we have already mentioned are not sufficiently explicit to demonstrate the antagonism of the defenses, reference need only be made to the seventh paragraph of Dr. Braune's petition to remove all possible obscurity. It states that Miss Dwyer became an invalid as a result of her fall and wholly unable to accept any employment. It then proceeds: "While she was in such state of invalidism said Dale caused her to become pregnant, and thereupon he sought to persuade her against her better instincts to bring about a condition, or to have a condition brought about in her

uterus and genital organs which would result in her miscarriage; that her condition during the months of December, 1934, and January, 1935, was one of extreme suffering and ill-health; that during said months said Dale was with her a great deal and sought to and did tamper with her genital organs, and at divers times used a catheter on her; that he prescribed and gave her medicines which had an injurious effect upon her internal organs, and some of which medicines were intended to bring about a miscarriage; that she suffered excruciating pain at times in the lower pelvis, and that her suffering and despondency finally became so unbearable that she attempted suicide on January 11, 1935, in the office of said Dale and had to be taken to the Cook County Hospital for treatment."

The matter of granting a separate trial is within the sound discretion of the court, but it is a judicial and not an arbitrary discretion. (*People* v. *Patris,* 360 Ill. 596.) It was apparent from the petitions that an actual and substantial hostility existed between the defendants over their lines of defense. Each was protesting his innocence and condemning the other. Each declared the other would take the witness stand and testify to a state of facts which would be exculpatory of the witness and condemnatory of his codefendant. Criminations and recriminations were the inevitable result. Ordinarily the right of one defendant to cross-examine his co-defendant does not exist. However, there is an exception to the rule, based on justice and necessity. Where one defendant has given testimony which tends to incriminate the other defendant, the latter, especially where he had no prior notice of such incriminating testimony, may cross-examine the former, but we know of no decided case where such a situation had been brought to the attention of the court prior to the trial and a severance was denied. Our attention has been called to *People* v. *Allison,* 325 Ill. 578. In that case Allison and Morville were indicted jointly as principals. On the trial each of them testified

as a witness in his own behalf and each sought to place the guilt on the other. Neither defendant knew what the other defendant would testify to until each testified on the witness stand. No motion for separate trial had been made. After Allison had testified and had been cross-examined by the State's attorney Morville's counsel also cross-examined him, and it was claimed that he usurped the functions of a prosecutor in his cross-examination. This court held that where co-defendants are represented by different counsel, who knew nothing of what the testimony of the other would be until they heard it from the witness stand, justice requires that the defendant who claims to be innocent shall have the right of cross-examination.

In the case at bar the trial court did not hold the petitions were insufficient to set forth the antagonism of defenses. In denying a separate trial for Braune the court said: "While the petition avers the interests of defendants are antagonistic, I believe the interests of each may be protected by admonitions or instructions to the jury as matters arise requiring protection against any clash of interests." It is our belief that no judge, however learned and skillful, could have protected the defendants in this case against their own hostility. The record shows in many instances that the defendants' witnesses were subjected to searching and critical cross-examinations by counsel for the antagonistic co-defendant. Frequently it extended beyond the field covered by the State's attorney and in some cases went into matters never inquired of by him. Four witnesses of Braune, including him, were cross-examined by Dale's counsel. Five witnesses for Dale, including him, were cross-examined by counsel for Braune. It was in one of these cross-examinations that the facts relating to Miss Dwyer's attempted suicide in Dale's office and their differences in religious beliefs were injected into the case. Irrelevant matters, such as the change of name of Dale, were brought out by counsel for Braune. A character wit-

ness, Dr. Henry E. Irish, was called by Dale. Dr. Irish had been a practicing physician for thirty-four years. He was professor of pediatrics at the University of Illinois, the pediatrician of the Cook County Hospital and of the University Hospital. He had known Dale a number of years and testified that his general reputation for being a peaceable and law-abiding citizen was good. The State's attorney did not cross-examine this witness, but counsel for Braune developed the fact that the witness was an instructor of Dale when the latter attended college and that he knew him then as "Udelsky." No further cross-examination of the witness was attempted. It is clear that the only purpose of that examination was to discredit the testimony of Dale. The trial was in many respects more of a contest between the defendants than between the People and the defendants. It produced a spectacle where the People frequently stood by and witnessed a combat in which the defendants attempted to destroy each other. Any set of circumstances which is sufficient to deprive a defendant of a fair trial if tried jointly with another is sufficient to require a separate trial. (*People* v. *Minnecci,* 362 Ill. 541.) The situation presented to the court upon the applications for separate trials required the granting of the petitions.

Inasmuch as this case will be remanded for a new trial, other errors appearing in this record may be hereafter avoided. It was not competent to show that a bastardy charge against Dr. Dale had been contemplated or that he refused to marry Miss Dwyer. The introduction of a curette was improper without more definite identification by Mrs. Crockett. The physical equipment of Dr. Braune's alma mater was immaterial. In this case no element of voluntary manslaughter appeared. The killing was not done upon a sudden heat of passion caused by provocation apparently sufficient to make the passion irresistible. If

manslaughter is the crime for which the defendants may be found guilty then it was involuntary manslaughter and the killing was the result of the commission of an unlawful act, but we give no expression of our views upon the weight of the evidence. However, we have no doubt that under a sufficient set of facts and circumstances an accessory may be prosecuted as principal and found guilty of manslaughter where death results from a criminal abortion. If the uterus is punctured in a criminal abortion and involves an intestine through incision or otherwise, and death follows as a result of the operation, a prosecution may be maintained.

Refused instruction No. 9 tendered by Dr. Braune was argumentative, and it was not error for the court to refuse it. The court properly refused instruction No. 6. The substance was contained in other instructions although in different language, but the same principle of law applicable to the same state of facts was elsewhere announced.

Dr. Harris was permitted to make many conjectures. He made a post-mortem examination. He, among other things, was asked if, as a result of his examination, he had an opinion as to what was the cause of death. This question called for a yes or no answer but he made the following answer: "I have such an opinion. Marie Dwyer in my opinion died of a generalized peritonitis and acute fibrinous purulent peritonitis resultant of a septic abortion." In his testimony Dr. Braune said that abortions might be generalized in two classes—septic and therapeutic. No precise definition was given of either term, but the words "septic" and "therapeutic" have fairly well understood meanings and are somewhat antithetical. The answer of the witness, while not as objectionable as was the answer in the case of *People* v. *Gleitsmann,* 361 Ill. 165, nevertheless should not have been permitted to stand.

A large number of criticisms are made concerning the admission and exclusion of evidence. The general obser-

vations which we have made in this opinion will furnish a sufficient guide for a future trial.

The judgment is reversed and the cause remanded, with directions to grant a severance and for new trials.

*Reversed and remanded, with directions.*