**STATE v DINGLEDINE et**

Ohio Appeal, 2nd Dist, Clark Co

Decided January 19, 1939

HORNBECK, PJ, and BARNES, J, concur.

686

Jerome A. Nevius, prosecuting attorney, and Benjamin Goldman, asst. pros. atty., John M. Cole, special counsel, all of Springfield, for the state.

Aaron J. Halloran and William M. Vance, Springfield, for Harry Dingledine.

Otho L. McKinney and Lewis L. Miller, Springfield, for Henry Dingledine.

Orville Wear and John R. Harner, Springfield, for Harry Chapman.

## OPINION

By GEIGER, J.

This matter is before this court for review, on questions of law, of the order and judgment of the court below in case No. 9151, wherein the appellants were convicted of and sentenced for a crime of first degree murder, without recommendation of mercy.

The record is voluminous and the assignments of errors numerous. Each defendant was represented in the court below by individual counsel and each has presented separate assignments of error and separate supporting briefs.

The transcripts of the docket and journal entries filed by each of the defendants below seem to be identical and the assignment of errors present to the court substantially the same questions, although not identical and not presented in the same order.

While we have given careful consideration to each assignment of each defendant, it would be repetitious to treat each in separate detail.

The transcript of the docket and journal entries is lengthy and we shall confine ourselves to such details as will properly exhibit the errors complained of by each defendant.

On the 16th day of September, 1937, the grand jury of Clark county presented

an indictment in substance that Harry Dingledine, Henry Dingledine, and Harry Chapman on or about the third day of September, 1937

"Unlawfully, purposely and wilfully killed Martin Randolph, a policeman of the city of Springfield, Clark county, Ohio, while said Martin Randolph was in the discharge of his duty as said policeman, contrary to §12402-1, GC."

The record discloses that by appropriate proceedings, counsel was appointed for the several defendants and proper pleas of "not guilty" were entered by all the defendants, and that many preliminary motions were made and disposed of.

The trial resulted in a verdict of guilty of each of the three defendants of murder in the first degree, without recommendation of mercy.

All defendants have filed assignments of error in this court the most important of which we will examine.

Harry Dingledine asserts 22 different grounds of error, among them; Irregularities in the proceedings of the court, the jury, the prosecuting attorney and the witnesses; that defendant was denied the benefits accorded to him by the Constitutions of Ohio and the United States; abuse of discretion by the court; misconduct of the prosecuting attorney and on part of witnesses; that the court erred and abused its discretion in granting the state's motion for a joint trial of the appellant and other defendants and in overruling the appellant's motion for a separate trial to his prejudice.

The assignments of errors of Henry Dingledine and Harry Chapman covered substantially the same grounds, with some additions later noted.

The first error alleged and urged, which is common to all defendants is the asserted abuse of discretion upon the part of the trial court in requiring that the defendants be tried jointly and overruling their several applications for separate trials.

This matter presents a serious question and one of great importance to each of the defendants as each has insisted consistently that he was entitled to a separate trial.

This claimed error brings to our attention two sections of the statute in reference to the trial of those jointly indicted.

Sec. 13442-11, GC, provides:

"When two or more persons are jointly indicted for a felony, except a capital offense, they shall be tried jointly unless

the court for good cause shown on application therefor by the prosecuting attorney or one or more of said defendants order that one or more of said defendants be tried separately."

Sec. 13443-3, GC, provides:

"When two or more persons are jointly indicted for a capital offense, each of said persons shall be tried separately unless the court for good cause shown, on application therefor by the prosecuting attorney or one or more of said defendants order said defendants to be tried jointly."

As to non-capital cases the provision is that those jointly indicted shall be tried jointly unless the court for good cause shown, either by the prosecuting attorney or one or more of the defendants order that one or more of the defendants be tried separately. The non-capital section does not concern itself with capital offenses. The court, however, is vested with a discretion, for good cause, to grant separate trials, but whether such good cause has been shown is left to the judgment of the court. When we come to the capital cases it is provided that when two or more are jointly indicted for a capital offense each shall be tried separately unless the court, for good cause, orders said defendants to be tried jointly. It is thus clear that in the non-capital case those jointly indicted shall be tried jointly, except for good cause, while in the capital case those indicted jointly shall be tried separately unless for good cause shown. The right granted to one indicted for a capital offense to have a separate trial is a right which may be overcome only for good cause shown, the burden of showing the same being upon the state. The prosecuting attorney in the instant case bases his claim for a joint trial, first, upon the fact that pressure of business in both criminal and civil dockets is such that for the orderly and proper administration of justice it will be necessary to try said defendants jointly. Second, that the same defendants have been indicted for the murder of Edward Furry, a crime alleged to have grown out of the same transaction and that the defendants Henry and Harry Dingledine have already been accorded separate trials; each occupying nine full days with the result that both the criminal and civil dockets have been congested and the trial of meritorious cases delayed. We doubt whether the condition of either the civil or criminal trial dockets would justify the

denial to a defendant of the right to a separate trial. The defendant is not responsible for the condition of the docket and there are methods provided by which the crowded docket may be relieved by the assistance of outside judges. It would scarcely be just to a defendant for the court to take the position that because other matters have crowded the docket the defendant should be denied that right which the statute gives him. Under the second branch of the motion, as a second supporting reason, the state asserts that both Henry and Harry Dingledine have already been accorded separate trials in a case identical with the one under consideration, except as to the victim and that each of these cases consumed considerable time. However good this reason may be as to Henry and Harry Dingledine, it would have no bearing upon the right of Harry Chapman who had not yet been tried under any of the indictments. The third ground is that the two preceding trials have disclosed the nature and character of the evidence so that the court is now able to conclude that each of the defendants can be given as fair and just a joint trial under this indictment as if they should be accorded separate trials.

It rests entirely within the judgment of the trial court as to whether the evidence produced in the former trials and its probable similarity to that to be produced in the instant trial constitute a good cause for the denial of the separate trial to each defendant. This court has no information upon which it can base a judgment to the effect that the court below abused its discretion in refusing the separate trials for reasons which were exclusively within the knowledge of the trial court and do not appear upon the record in this case. Each of the defendants sets out vigorously and repeatedly the reasons why, in his judgment, he could not secure a fair trial if required to be jointly tried with his co-defendants. Some of the reasons seem to us to be of little weight, while others may be considered as more impressive. Nevertheless the duty rested upon the trial court in the possession, as it was, of certain information touching the rights of the parties to determine whether or not justice could be done at a joint trial, or rather, whether or not a joint trial would deprive any one of the defendants of any right to which he was entitled. Counsel for defendant Chapman insists that the defenses are antagonistic, that some of the evidence is admissible as to one and not to the other, that to be forced to trial with two who have been heretofore convicted in a similar case would jeopardize the chances of the one not having been so tried. Defendants cite the case of **State v Fox, 133 Oh St, 154, 10 OO 218,** and urge that the case is not applicable because it does not concern a capital offense, while the state takes the position that it is determinative of the question.

We have no hesitancy in holding that under the statute the matter rested in the sound judgment of the trial court and that because the trial court ruled against the defendant is in itself no indication that there was an abuse of discretion. The abuse of discretion must be affirmatively shown. See **State v Wright, 59 Oh Ap 191, 12 OO 464.**

We think the action of the court in this case falls clearly within the rule there stated. As before stated, we have not before us those matters which were within the knowledge of the court. The statute has given to the court the right to determine whether good cause has been shown for a joint trial. We do not perceive that the statute violates any provision of the state or federal Constitution. Of course, a cause must be shown upon which the court can properly base its order for the joint trial. We therefore are of the opinion that the order of the court overruling the motions of the several defendants for separate trials and ordering that there be a joint trial was not prejudicial error.

Having disposed of the question as to the error predicated upon the order of the court for a joint trial which affected all the defendants, we take up the examination of the other assignments of errors advanced by the several defendants following the order of errors assigned by Harry Dingledine as they seem to be the most inclusive.

The first assignment is that there were irregularities in the proceedings of the court and the assignment is especially addressed to the fact that over the objection of the appellant the court ordered a venire of 75 names to be drawn from the jury wheel for service in the joint trial of the three co-defendants, wherein the court overruled the appellant's motion that the court order a minimum of 150 names to be drawn. Appellant Harry Dingledine cites §13443-1 to the effect that when a person indicted for a capital offense pleads "not guilty" the clerk shall draw from the jury wheel, as in other cases, not fewer than 50 ballots nor more than 75 as the court shall direct.

§13443-2 provides for a special venire in capital cases necessitatea by the exhaustion of the original panel which shall be selected by the court. Either party can demand and have a special venire to fill the panel. The appellant's contention is that each of the three defendants jointly tried was entitled to an original venire of at least 50 names or a minimum of 150 for the three defendants and the appellant especially stresses the use of the word "person" in the statute claiming that for each person so tried there shall be 50 names, asserting that if it was the legislative intent that where more than one is indicted and tried for a capital offense, the drawing should be of not less than 50 nor more than 75 names, that the statute would have read "when a person or persons indicted for a capital offense." It must be conceded that the right to have drawn from the wheel the minimum number is an important right for one charged with a capital offense in that upon the exhaustion of the panel so drawn the right is reposed in the court to select a special venire and naturally each one on trial for a capital offense would regard it as a valuable right to first have the jury drawn from the wheel rather than from the special venire selected by the court. However, ingenious this argument may be, we are controlled by the provisions of the statute as it is written and not as we think is should be. Aside from the fact that §12368, GC provides that "the singular number includes the plural number" and that therefore §13433-1 may be properly read "when person or persons is indicted etc.," there yet remains the fact that the section was in force long before the adoption of §13443-3, GC providing for a joint trial in capital cases and yet there was no amendment of §13433-1 providing that in case of a joint trial there should be drawn from the jury wheel not fewer than 50 ballots for each defendant. Nor does the section providing for a joint trial in capital offenses provide for the minimum number of jurors for each person indicted.

Sec. 11419-48 provides that when it is necessary to summon talesmen the court on motion of either party shall select them and cause to be issued immediately a venire for as many persons naving the qualifications of a juror as in the opinion of the court may be necessary.

Sec. 11419-50; GC provides that a challenge to the array may be made and the whole array set aside by the court when the officer who executed the venire did not proceed as prescribed by law. The sections above referred to relate to civil trials, but indicate the proper procedure under §13443-2 where a challenge is provided for, and the procedure of the whole array is set aside.

When the first order was issued directing the clerk to draw from the wheel 75 names, the defendants, if not satisfied with the method of drawing or the number drawn could have challenged the array and on each subsequent special venire issued, when the original venire was exhausted, the defendants had the opportunity to challenge the arrays on the ground that the original drawing from the wheel should have contained at least 150 names. They did not do this and aside from our view that the original drawing of 75 names from the wheel was sufficient to comply with the provisions of the statute, if the defendants treated that drawing as sufficient and the subsequent drawings and names selected by the court as unobjectionable, they can not now be heard to assert that the court erred in the original order or in the subsequent special venires. The defendants had the right to challenge the array at any point and have their rights determined, based upon their own asserted claim that at least 150 names should have been drawn from the wheel. We are of the opinion that there is no error manifest on the face of the record prejudicial to the rights of the defendants in selecting the jurors and the assignment of error on this point will be overruled.

The next assignment we note is based upon the alleged misconduct of one Russell Shirk a deputy sheriff assigned as a special guard during the incarceration of the appellant and his co-defendaants. Shirk was called as a witness for the state to identify certain notes written in jail by the appellant, Harry Dingledine to his son Henry Dingledine, which notes were subsequently introduced. The deputy sheriff testified that he conceived the idea of writing notes as coming from Henry to his father, Harry, and delivering them to Harry and notes as coming from Harry to his son, Henry, and delivering them to Henry. It is asserted that the alleged notes delivered by Shirk called for an answer and Shirk promised to deliver the answer. Instead of this, he turned all the notes written by Henry or Harry over to the prosecuting attorney and substituted for them other notes delivered to the addressee or the original. It is disclosed that the passage of the notes was known to the prosecutor's office and it was disclosed that deputy Shirk delivered

as Harry Dingledine's at least 27 notes. Twelve of the 27 notes procured by Shirk from Harry Dingledine were introduced in evidence over the appellant's objection and the other notes were introduced upon the demand of the defendant. Inasmuch as all the notes were introduced and considered by the jury, we need not go into a detailed examination, but must only pass upon the question as to whether this procedure of the deputy sheriff, known to the prosecuting attorney, to get incriminating statements from the father and son was such an abuse upon the part of the state as to constitute a reversible error. While we have no inclination to endorse such a transaction, yet we may not say that it constitutes reversible error. It was ██ not the entrapment of the defendants in the commission of a crime, but was an effort made to get admissions by the defendants that might be used against their interests upon the trial. Where the state is endeavoring to solve a case against defendants not by procuring false testimony but by intriguing the accused into making admissions against his interests there is no point at which we can say the state has deprived the defendant of any right or inflicted upon him any hardship which may not be the legitimate outcome of the crime being investigated. If it were otherwise many legitimate activities of the detectives and state officials would not only be ineffective in the detection of crime but could be used as a means to avoid conviction. We are convinced that there is no error shown in this matter.

As a further objection to a joint trial, it is asserted that evidence incompetent as to the defendant was admitted as to the other defendants with instructions by the court as to which of the three defendants it could be considered against and that while theoretically the jury is supposed to follow the instructions of the court, that practically it was impossible for the jury to distinguish between the competency and incompetency of the evidence so introduced. Counsel further point out that Harry Chapman, a co-defendant, had given at least five statements to the authorities in four of which he absolved the appellant from any connection with the robbery or subsequent events and that in the fifth statement he reversed his earlier stories and involved the appellant and that the appellant was faced with an antagnostic co-defendant and that counsel was obliged to assume the role of the prosecuting attorney. This may have worked a hardship upon the appellant, but to no greater

extent than the testimony of any antagonistic witness and the whole matter was a proper one for the consideration of the jury. Other matters are stressed in relation to the joint trial, which, we think, we have already sufficiently examined. Counsel cite as sustaining their position as to the right for a separate trial, certain cases from other states, to-wit: People v Sweetin, 325 Ill., 245; People v Patris, 360 Ill., 596; People v Braune, 363 Ill., 551; People v Blumenfield, 351 Ill., 87; People v Wargo, 268 N. Y. Sup., 400.

These authorities present very pertinent principles as applicable in the states where the cases were tried, but we are still of the opinion that, under the Ohio statute, the judgment rests with the trial court and there must be shown to be an abuse of discretion.

We reiterate our view formerly expressed as to the right of the court to require a joint trial and are of the view that the order of the court has not been shown to be an abuse of discretion or prejudicial error.

Counsel for the defendant further discuss assignments of error to the effect that the verdict was not sustained by sufficient evidence; incompetent evidence was admitted; competent evidence was excluded.

Counsel urge that there was no evidence that any arrest was intended when the officers arrived at the cottage or of any notice of an intention to arrest before the officers broke into the cottage and no evidence of intention to arrest anyone inside the cottage; that the evidence is simply that the officers, after they forced open a window, went into the cottage and that upon their entrance the shooting began and further there is no evidence of how Randolph met his death except the incompetent hearsay testified to by Detective Clericus, record p. 155, and they point out the testimony of Harry Dingledine to the effect that he started to open the door for the officers but was prevented by threat made by Cornette, a robber who was killed, and that consequently there could have been no conspiracy on his part to resist the arrest. These matters all involve a question of evidence proper to be submitted to and considered by the jury. There was evidence that two of the officers went to the rear door and demanded admission and afterwards went to the front door and demanded admission and further there is evidence of those within the cottage that they discovered the approach of the officers and the appellant testifies that he sought to open the door. All these mat-

ters were considered by the jury under a proper charge by the court and we are not at liberty to disturb the verdict on that account.

As to the evidence as to how Randolph met his death there is testimony as to the shooting inside of the room and the jury could properly conclude that his death resulted from the fusillade in his direction and involved the firing of many shots by several people.

. Objection is made to the testimony touching the death of Edward Furry, a deputy sheriff. We think this competent as part of the transaction from which the death of Randolph arose, and find no prejudicial error in the acceptance of this evidence. Counsel insist that in practical effect, the appellant, Harry Dingledine, was tried for the killing of both Furry and Randolph although the indictment only charged the killing of Randolph. We think this matter was kept clearly before the jury by proper instructions.

Serious objection is made to the admission of the statement of Martin Randolph, the murdered policeman, made to Clericus when Clericus testified that Randolph told him about the shooting and stated that "several men had come through the room from the kitchen at the same time and they were all shooting at him" and said, "I got one of them as he went out of the front door, I am sure, and I may have got the number two man." It is urged that when Detective Clericus arrived at the cottage the shooting was all over, that Cornette was dying in the front yard, Chapman had escaped and was hiding in the weeds and the Dingledines had left in their car. This conversation of Randolph was admitted as part of the res gestae, and we do not discover any error in this as the incident and declaration were so close in point of time as to be properly admissible as part of the res gestae. O. Jur. Vol. 12, p. 372, §347, et seq.; Vol 17, p. 343, §274, et seq; State v Lasecki, 90 Oh St 10; contra Wade v State, 2 C. C. (N.S.) 187.

: Counsel urge that there were many instances in the trial where the evidence was not competent as to the appellant, but admitted over his objection on the theory that instructing the jury cured the resulting prejudice. The court gave the proper instruction as to the competency of the evidence against the parties making the admissions and their incompetency as to others and we may not assume that the jury disregarded the instructions of the court.

. Counsel for Harry Dingledine groups together assignments of error. Counsel point to the fact that the indictment is based on §12402-1, GC which provides in substance, that whoever purposely and wilfully kills a sheriff, etc., while such sheriff, etc., is in the discharge of his duties, is guilty of murder.

It is urged that the fact as to whether or not Randolph was in the discharge of his duties is an essential element of the offense and that the state has failed in its proof of this element and counsel discusses at large the testimony touching this point. They also assert that there is no evidence that any of the officers had a warrant for the arrest of anybody or that they were to arrest anybody, but were simply to investigate. A similar question arose in the case of State v Stephen Figuli, 13 OO 363, decided by this court on the 6th of October, 1938. In that case the police officers approached the rooms which the defendant had made his place of refuge after a robbery, which had been completed, and approached the hideaway, not for the purpose of arresting the bank robbers, but for the purpose of making inquiry about another individual not connected with the robbery. There was no indication that any of the officers had the slightest information that the bandits were in the building. This court in that case held that the defendant, under the circumstances, could be convicted of murder of an officer killed while in the discharge of his duties and while the facts are not identical the principle is the same as in this case. Taking all the facts into consideration, that there was a robbery; that officers under the direction of their superiors had been sent to search for the participant and that in doing so they entered the cottage where Randolph met his death, the jury was justified in concluding that the officer was in discharge of his duties when killed. Counsel for defendant point out the fact that an arresting officer may break down and enter a dwelling house only if, after notice of his intention, he is refused admittance and also point to §13432-5 providing that when an arrest is made without a warrant, he shall inform the person arrested of his authority and cause of the arrest. It is asserted that there is no evidence that there was any notice of any intention to arrest anybody or that admittance was refused after such notice before the windows were forced. The court charged that unless the state has proven beyond a reasonable doubt that Randolph, acting for himself or under the

692

direction of a superior officer or in collaboration with some duly authorized officer, had a warrant for the arrest of Harry Dingledine or being without a warrant either himself or some other peace officer with him gave notice of their intention to arrest Harry Dingledine or some persons then occupying the dwelling house and was refused admittance, that the forcible entry into the house then occupied by Harry Dingledine was illegal and if the said Martin Randolph did so enter said house illegally, he was not in the lawful discharge of his duty and the jury must return a verdict of "not guilty" as to the defendant Harry Dingledine. That is as favorable a charge as under the circumstances, could be made for the protection of Harry Dingledine and in the face of such charge, the jury found him guilty. It seems to us that there was an abundance of evidence that the officers were in hot pursuit of the robbers; that sufficient warning was given and demand that they surrender and that the robbers, as testified to by Harry Dingledine, knew that the officers were there for the purpose of making an arrest. When things are happening so quickly, it is proper for the jury to make inferences from the circumstances, even though there may be no formal testimony as to the purpose of the entry by the officers. There was no time to get warrants and the officers did all that was required of them to make known their purpose of seeking the arrest of those within the cottage before the firing began. We are not of the opinion that there has been a fatal failure in not showing that the officer was in the discharge of his duties and that sufficient notice had been given to the inmates of the cottage and we are of the opinion that they had sufficient knowledge that the officers were in discharge of their duty.

It is asserted that on pages 1451 and 1452 the court erroneously charges as to aiders and abettors as follows: .

"You are instructed that the words, 'aid, abet or procure' are to be taken in their plain and ordinary meaning—aiding and abetting, in brief, mean intentionally giving assistance to the actual perpetrator of the crime, before, after, or during its actual commission."

It is urged that this charge is erroneous and prejudicial in that the jury is instructed that one who aids and abets one who has committed a crime after the commission thereby becomes a principal and that this is especially detrimental to the appellant in that he assisted his son in escaping after the commission of the offense and also sought the assistance of others in the disposition of the guns in the back of the fleeing machine. It is urged that the jury could well conclude that it did not believe that Harry Dingledine shot anybody or helped anyone else to shoot, but the judge said if he gave assistance to the actual perpetrator after the commission of the crime he was an aider and abettor and should be found equally guilty. As so frequently happens, the selection of disjointed sentences and their segregation from the body of the charge often makes an appearance of a prejudicial charge which is not incident to the charge as a whole. The court in his charge quotes §12380 to the effect that whoever aids, abets or procures another to commit an offense, may be prosecuted and punished as if he were the principal offender.

The court further charged:

"But you are again instructed that the defendants Harry Dingledine, Henry Dingledine and Harry Chapman are each charged with the crime of purposely and wilfully killing a policeman while in the discharge of his duty.

"They are not charged with robbery or resisting arrest and when considering and deliberating upon the particular or individual case of any one of these defendants before you can find such defendant guilty, even though he did not fire the fatal shot or shots, you must be convinced beyond a reasonable doubt that he aided or abetted the autual killer or procured him to commit such killing and that such killing aided or abetted by him or procured by him to be done was done purposely and wilfully. Unless the evidence does establish beyond a reasonable doubt all these facts in addition to every other material element involved, then it is your duty to return a verdict of not guilty as to such defendant."

The entire charge of the court is clearly to the effect that the aiding and abetting means intentionally giving assistance to the actual perpetrator of the crime before or during its actual commission. It would be a strained construction to say that the inclusion of the word "after" means the doing of some act which was not in itself connected with the crime or its actual perpetration, but some act participated in by the defendant entirely disconnected with and subsequent to the actual

perpetration. The charge of the court is clearly to the effect that no hold one liable as a principal because he aids and abets or procures another to commit an offense, such person must aid, abet or procure the actual commission of the crime and is not subject to the construction that by the inapt use of the word "after" all who perform any act subsequent to the crime thereby become principals. While the use of the word "after" is unfortunate we are unable to say that it is subject to the construction urged by the appellant and we are of the opinion that it does not constitute prejudicial error.

It is further contended that the court erred in failing to charge the jury to disregard all testimony as to the alleged holdup of Robert Smith and on the contrary charged them as to the law of robbery and its application to the evidence.

The court charged in substance that the jury may consider such evidence as the court has admitted of other offenses only for the purpose and for the reasons outlined and that while the robbery is not the specific crime charged, yet certain evidence has been admitted as to the alleged robbery. The court charged:

"I instruct you this evidence is to be considered only with reference to the issue whether the officer of the law mentioned in the evidence, having reasonable grounds to believe that a felony had been committed and having, after due notice, ██ been refused admittance to the Crystal Lake Cottage mentioned in the evidence, lawfully broke and entered such cottage.'

The court was careful to instruct the jury that the evidence of the robbery was only permitted as it affected the right of the officers to enter the cottage and whether or not in doing such, they were in the discharge of their duties.

Counsel assert that a grave injustice has been done and that one of the objects of the trial was to send Harry Dingledine to his death; that a verdict, carrying with it the death penalty, had already been secured against Henry Dingledine so that there was no object in again prosecuting 'him" and that the defendant Harry Chapman was, in effect, a witness for the state. It is asserted that the whole effort of the prosecutor was directed at Harry Dingledine' whose verdict in the previous case carried with it a recommendation of mery, which did not satisfy the prosecuting attorney. "This court can not be concerned with the purpose the prosecutor may have had in insisting on a further trial of Harry Dingledine after he had been convicted on an indictment for the murder of Edward Furry, with a recommendation of mercy and after his son had been convicted on another charge without recommendation of mercy, leaving Chapman the only one who had not been convicted. It is our province only to determine whether or not there has been any prejudicial error.

Generally as to the claim that the verdict is against the weight of the evidence it is not necessary to restate at length the facts leading to the indictments as they have already been stated and restated. The only position we may take is that we are not justified, where there has been such conflict of testimony as in this case, in setting ██ aside the verdict of the jury if the defendants have had a fair trial and if there has been no prejudicial error evidenced by the record.

We will take up, in more detail, the assignments of error of Chapman and Henry Dingledine where they have not already been substantially covered by what we have already said.

Examining in separate detail the errors complained of by Harry Chapman, we find many of them covered by the matters already passed upon.

Chapman points out that his defense was to the effect that when the officers arrived he was in the upstairs room asleep; that he was awakened by the gun fire and came down only when the shooting had ceased, leaving his glasses, without which he had poor vision, in his room and that he did not participate in either the shooting or the conspiracy. This, of course, is a matter for the jury. There were witnesses to the effect that he actually participated. He urges that the evidence shows that he did not discharge the shot gun and that the evidence was such as to preclude a finding that he came from the upper room and participated in the shooting and that all the evidence shows that the verdict is manifestly against the weight of the evidence in reference to his guilt. We have the same remarks to make in reference to his claim that we have heretofore made in reference to the claims of the others.

Generally we may say that we feel that the defense made by each of the defendants was a matter for the consideration of the jury whose duty it was to weigh the entire evidence under the instruction of the court. The function of the jury may not be invaded by the court because counsel has

694

skillfully urged certain matters which were likewise urged to the jury.

We think it would be a waste of time to go into detail in reference to the offenses charged and the evidence pro and con on the issues raised. The matters are too well known to require this reiteration. We therefore are of the opinion that the record does not disclose any prejudicial error. We recognize the fact that we have not covered in the detail that counsel might have desired several of the objections, but we have read the claims and have given them all consideration as well as having read the entire record, some of it a number of times.

The Legislature has circumscribed the authority of a reviewing court to grant a new trial or reverse a judgment in criminal cases by §13449-5.

We are of the opinion that all matters presented by counsel in their several briefs fall within the curative provision of this statute.

We are of the opinion that no prejudicial error has been exhibited to us and that the judgment of the court below should be affirmed.

BARNES, PJ, and HORNBECK, J, concur.