THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JEROME DIXON, Defendant-Appellant.

Fifth District   No. 5—87—0408

Opinion filed June 16, 1989.

Daniel M. Kirwan and Mary M. Menard, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

John Baricevic, State's Attorney, of Belleville (Kenneth R. Boyle, Stephen E. Norris, and Ellen Eder Irish, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE GOLDENHERSH delivered the opinion of the court:

After a bench trial in the circuit court of St. Clair County, defendant, Jerome Dixon, was found guilty of murder (Ill. Rev. Stat. 1985,

ch. 38, par. 9—1(a)(1)) and sentenced to 25 years in the Department of Corrections. On appeal, defendant raises the following issues: (1) whether the trial court denied his right to a trial by jury when the court repeatedly denied his motion to sever; and (2) whether he was denied his right to a fair trial when the trial judge sitting as finder of fact prejudged defendant's case.

On December 5, 1986, an indictment was filed charging defendant as well as Carlos Wilson, Frederick Patterson, Lee West, Edward Washington and Cortez Gregory with the murder of John Weir. The public defender's office was appointed to represent the defendant but later a motion to withdraw was filed, alleging that since defendant and the other codefendants were all represented by the public defender's office, it would give rise to a conflict of interest. The trial court granted the leave to withdraw and appointed private counsel for defendant.

Defendant's counsel filed a motion to sever on January 12, 1987, with a memorandum of law in support. On January 16, 1987, the court held a hearing on the motion to sever. However, the court granted the motion to sever only Washington from the other codefendants and ordered that Washington be tried separately.

On February 25, 1987, defendant again presented his motion to sever but the trial court denied the motion. When the joint trial began on March 9, 1987, the trial court addressed defendant's motion *in limine* to exclude any codefendants' testimony regarding defendant's participation in the offense. The trial court denied the motion and defendant subsequently waived his right to a trial by jury. After jury selection, the court denied defendant's renewed motion to sever. Defendant's bench trial was conducted simultaneously with the jury trials of Wilson, West, Patterson and Gregory.

At the bench trial, the following facts were adduced. Rochelle Quilling, a resident of 43F Roosevelt Homes, saw most of the fight on October 5, 1986, because the fight occurred in the backyard of the home in which she was residing. Between 9:30 and 10 p.m. that night, her niece ran into Rochelle's sister's bedroom where Rochelle was watching television and told her that Freddie Patterson was fighting a young man. (The young man was later discovered to be John Weir, the deceased victim.) Rochelle looked out her sister's bedroom window and did not see anything. She left the window until her nephew came into the bedroom and told her that a fight started again. She then looked again and saw a group of three young men dragging Weir around the side of the building. The young men dragging Weir were Patterson, West and an unknown male.

Rochelle left the window again but came back and saw that Weir was being held up by some of the young men while others were punching and kicking him. There were about 13 young men involved in the beating. They were beating Weir in her backyard. She heard some of them yell "Kill him," and then saw some of them beating Weir with chairs. At this point, the beating had been going on for about 15 minutes. She then saw West pick up a chair and hit Weir across the chest, causing Weir to fall.

Rochelle again left the window to find her brother Randy, but he was not home. When she went back to the window, she saw that they stood Weir up again and began kicking and punching him. At this time, she left the window, going downstairs and outside into the backyard. She saw that they were still beating Weir as others held him up. West again picked up a chair and said "Let him go so I can hit him with this chair." At that point, a young man called "Peanut" (later identified by her sister, Eutha Quilling, as Rufus Lloyd) stopped West and told him not to do it because West had already hit him once.

After Rochelle left and went inside again and called the police, she came back outside. She heard Lloyd tell defendant Dixon to "stop beating the guy and fighting him," and "Quit fighting the boy and beating the boy." She then heard defendant respond that he was going to kill him because he should not be stealing from the "Folks." ("Folks" is a term for members of the Disciples street gang.) Wilson yelled, "Kill the m----- f-----," and she heard Patterson say as he stood over Weir, "I don't like St. Louis jimmies no way." Patterson, Gregory, West, defendant and the rest of the group began to beat and kick Weir. During this time she saw "Winkie" (whom she later identified as Edward Washington) stand on top of the garbage can stand and jump off onto Weir's chest. Someone then yelled, "Drag him to the water. Drag him to the water." Gregory and Patterson grabbed Weir by the legs and began to drag him to the water but did not put him in the water because someone yelled "Don't put him in the water. Put him in the trunk of the car." They then dragged him from the water to the trunk of Weir's car.

During that time Benny (later identified as Elliott Johnson by Weir's aunt, Geraldine Brady) asked Wilson to stop the beating, stating, "You don't have to kill him. Just beat his ass." Wilson responded, "We going to kill this m----- f----- because he shouldn't be stealing from the Folks," and then continued to yell, "Kill that m----- f-----." They eventually dragged Weir back to the car and threw him on top of the hood. She knew that all four codefendants and defendant Dixon were members of the Disciples street gang.

Randy Quilling, Rochelle's brother, stated that on that night between 9 and 9:30 p.m., he left his girlfriend's house in Washington Park to go home to 43F Roosevelt Homes. He entered the home through the back door, went upstairs and lay down in his bedroom. Ten minutes later his niece told him that there was a fight outside and that "Freddie Patterson has just busted a dude in the face." He went downstairs and opened the back door but saw that everyone was gone. He looked around the corner of the house and saw people holding a young man up by the shoulder.

Randy went back inside and into the living room. Twenty minutes later he heard a great deal of arguing outside and again went outside through the back door. He saw five or six young men dragging Weir by his feet from the side of the house to the trash can support. Four men picked Weir up and Patterson began to beat Weir in the face. Washington was also involved in beating Weir. Eventually, more of the young men began to beat up Weir. Wilson said, "Kill him. Kill him." At that time they let Weir go and he fell to the ground. Soon thereafter, Washington stood on top of the trash can support and jumped onto Weir's chest. Washington then beat Weir in the chest with a chair. Someone then yelled, "Throw him in the water." As they again began to drag Weir, Johnson said, "Don't throw him in the water." When they dragged Weir back, Patterson kicked Weir in the chest. Randy then called the police. Defendant yelled, "Throw the s-- of a b---- into the trunk." At that time Patterson checked Weir's pulse and stated that he was dead and that they should leave. Randy knew that defendant and his codefendants were members of the Disciples street gang.

Eutha Quilling, 29 years old, sister of Rochelle and Randy, also lived at 43F Roosevelt Homes. Around 9:30 to 10 p.m. on October 5, she was in her bedroom watching television. At approximately 9:45 p.m. she heard some "cussing and hollering" in her backyard. When she looked out her bedroom window, she saw Patterson and another young man (Weir) fighting and others trying to break it up. After five minutes she left the window.

However, she went back to the window because she heard lots of noise, laughing and talking. She saw that the young men had drinks. Again she left her window to watch television but returned to the window around 10:30 p.m. She saw that the young men were holding Weir by his arms and beating him. Weir told them to break his arms, break his legs, but not kill him. They were hitting him in the face, neck and chest. Afterward, someone threw him on the ground. Eutha left the window because her smaller children were in the bathroom

and were upset. As she looked out the bathroom window, they were again hitting Weir. She left the bathroom and went to her bedroom to sit down but she kept going back to the window to look out. The next thing she saw was the young men dragging Weir to the water and kicking him but then dragged Weir back to the trash can. She saw one young man get on top of the trash can but that was all because she left the window. She looked out again and saw the young men drag Weir to a car. Patterson and Gregory were talking about throwing Weir in the trunk, but did not. At that point Patterson checked Weir's pulse and said he was dead. Eutha did call the police, who told her to call 911, but she did not because her little girl was crying. The young men who were kicking and hitting Weir were West, Wilson, Gregory, Washington, Patterson and defendant. During the fight, she heard Wilson yell, "Kill the m----- f-----. Let him die. He don't steal from the Folks [a term for members of the Disciples street gang]. You bet he don't steal no more." Others were yelling "Kill him." She did not know the victim. Sometime during the fight, she heard a knock on her door. It was Elliott Johnson, whom she gave permission to use the phone.

Elliott Johnson took the stand and said that he knew Weir for a couple of weeks. He met Weir through Weir's aunt. He, Weir and Gregory drove to the Roosevelt Homes that evening to look for Patterson. Gregory wanted to talk to Patterson about some money. Weir was driving a car his aunt gave him to use and they picked up Gregory's girlfriend, Angie. After they had stopped the car, it would not start and they tried to find someone to give it a jump start. When they did not find anyone to give them a jump start, they returned and sat in the car. At that time, Wilson came up with his radio. At some point, Weir had his radio out. Wilson's and Weir's radios were on and they were listening to them.

The group then left and went to a liquor store on Bunkum Road. At the liquor store, Johnson met with defendant, who asked him about Weir. When they left the liquor store, defendant was with them. When they reached the car about six more people came. About an hour later Wilson discovered his radio missing. Defendant went to Weir's car and found the radio. Weir said, "How did the radio get into the car?" Wilson began to argue with Weir. Defendant hit Weir and then Wilson hit Weir. Soon Washington and West joined in hitting Weir. Weir did not hit back. Johnson, Patterson and Gregory tried to break up the fight. After the group hit Weir a little while longer, Weir fell and Wilson kicked Weir once. Gregory pushed Wilson away and they began to argue.

Patterson helped Weir off the ground and said he was going to call someone to get them. At that point Johnson went to the Quillings' house to use the phone. Johnson called his own mother and Weir's aunt. When he returned outside, he saw Patterson make an attempt to do mouth-to-mouth resuscitation. Johnson and Patterson put Weir on top of his car. The ambulance came and took Weir.

Dr. Stephen Nuernberger, pathologist with the St. Clair County Coroner's office, examined Weir's body. He observed that Weir's body had multiple abrasions and contusions of the head and chest. Muscles of the anterior chest wall revealed multiple areas of hemorrhage. The right lung had collapsed and there was a laceration of the sac around the heart and of the right ventricle of the heart. Underneath the scalp were multiple subgaleal hemorrhages. He concluded that death was "due to rupture of the right ventricle caused by traumatic compression of the chest and due to multiple blows to the chest and head."

At the conclusion of the State's evidence, defendant presented two persons to attest to his reputation for truth and veracity. Defendant thereafter took the stand.

Defendant stated that he was 18 years old, unemployed and last attended twelfth grade at East St. Louis High School in the special education program. He was a member of the Disciples street gang for three years but he is not a member now and has not been a member since he was arrested for burglary in 1985.

Between 6 and 7 p.m. on October 5, 1986, defendant was with Cory Phillips at the liquor store. About five minutes later, Weir, Johnson, Gregory, Cynthia Johnson and another girl came into the liquor store. Cory and Elliott talked for a while. Defendant learned that Cory and Elliott were supposed to get money from Weir, and Cory asked if Weir was a Vice Lord (another street gang). Defendant did not know the victim's name until he was arrested that night.

Defendant left the liquor store and walked Gary Rodd home because he was drunk. Defendant went back to the liquor store and saw, in addition to Weir's group, Patterson and Wilson. They told him about the fight between Weir and Patterson. They all left after Patterson bought some alcohol for them.

When they arrived at 43F Roosevelt Homes parking lot, they began drinking, singing, dancing and talking. At some point Washington arrived. The music was coming from Wilson's and Weir's portable radios. Wilson had left the group. When he came back he discovered that his radio was gone and started to ask Patterson, then defendant himself about it. Defendant told him that he saw Weir go to his car and that Weir was the only one near the radios. Wilson asked Weir

but Weir said he did not know. At that point everyone began to look for Wilson's radio. Wilson found his radio in Weir's car. Wilson also found his missing tape in Weir's pocket and took it from Weir. Weir then jumped at Wilson and Wilson hit Weir. Weir fell down and that is when Washington jumped on his chest. Someone then kicked Weir in the chest.

Defendant denied hitting Weir during the fight but stated that prior to Weir's fight with Wilson he hit Weir because Weir accused him of putting the radio in his car. Patterson then began to drag Weir to the water but Johnson told him not to do it. Patterson and Johnson picked Weir up and put him on the hood of his car. Defendant did not see Weir take the radio and did not hear anyone yell anything during the fight.

Defendant's first issue is whether the trial court erred when it refused to grant his motion to sever. Defendant specifically argues that when the trial court repeatedly denied his motion, it forced defendant to forgo his constitutional right to a jury trial. The State responds that after an examination of the record and case law, severance was not necessary because "the defenses presented were not genuinely antagonistic prior to the point in time at which defendant's trial was severed from that of the other defendants." The State also points out that defendant's waiver was knowing and voluntary.

■ It is well established that every person accused of an offense has the right to a trial by jury unless the accused has voluntarily and understandingly waived that right in open court. (Ill. Rev. Stat. 1985, ch. 38, par. 103—6; Ill. Const. 1970, art. I, §8.) The test of voluntariness depends upon the facts and circumstances of each case. (*People v. Rynberk* (1980), 92 Ill. App. 3d 112, 118, 415 N.E.2d 1087, 1092.) In this case the test of voluntariness is connected with the grant or denial of a defendant's motion to sever.

■■ Under section 114—8 of the Code of Criminal Procedure of 1963, a trial court will grant a severance where "[a] defendant or the State is prejudiced by a joinder of related prosecutions or defendants in a single charge or by joinder of separate charges or defendants for trial." (Ill. Rev. Stat. 1985, ch. 38, par. 114—8.) The test for whether severance of persons jointly indicted for a commission of a crime should be granted is whether the defenses are of such an antagonistic nature that severance is imperative for a fair trial (*People v. Baer* (1976), 35 Ill. App. 3d 391, 400, 342 N.E.2d 177, 184) and separate trials are appropriate to avoid prejudice (*People v. Daugherty* (1984), 102 Ill. 2d 533, 541, 468 N.E.2d 969, 972). A defendant's motion for severance must specifically demonstrate the prejudice he fears and

mere apprehensions of prejudice are insufficient. (*People v. Bean* (1985), 109 Ill. 2d 80, 92, 485 N.E.2d 349, 355.) Granting or denying a motion to sever is within the discretion of the trial court, and a decision to sever will not be reversed unless it is demonstrated that the trial court abused its discretion. *People v. Lee* (1981), 87 Ill. 2d 182, 186, 429 N.E.2d 461, 463.

Defendant alleges that the post-arrest statements made by Wilson, Patterson and Gregory which implicated defendant as having instigated and participated in the "unfortunate melee" which led to Weir's death point out the prejudice. However, the State announced at the January 16 motion hearing that it was not going to use the pretrial statements, and, in fact, the State did not use those statements.

In *People v. Braune* (1936), 363 Ill. 551, 2 N.E.2d 839, the supreme court defined a classic example of antagonistic defenses as one in which each defendant protests his innocence and condemns the others, thereby creating a situation where "actual and substantial hostility exist[s] between the defendants over their lines of defense." (363 Ill. at 555, 2 N.E.2d at 841.) In this case, defendant did not present any plans of defense which demonstrated a true conflict which rose to the level of prejudicial antagonism. Furthermore, as the State argued at the January 16 motion hearing:

> "If we tried this one time, if we tried it six times, we will produce the identical evidence, the same witnesses. We will say the same things. And they will inculpate every one of these individuals to the same degree. They are all going to be actually involved. *** They talk about the differences. But the difference they are referring to is only talking about differences in some of the statements that a few of these defendants have made. That's not even in the State's case."

In this case defendant does not deny being present during the beating. Only if codefendants had taken the stand, absolved themselves of the offense and stated that defendant was the perpetrator would a true antagonistic defense be involved and a severance be necessary. This court finds that prior to the trial court eventually granting the severance, no actual antagonistic defense was present. After defendant's case was severed, the testimony defendant feared was elicited at trial. Although defendant unsuccessfully sought to exclude the testimony of his codefendant, he nonetheless knowingly and voluntarily waived his right to a jury trial after the court fully advised defendant of the ramifications of the waiver.

When defendant made his second motion for severance, he re-

quested that the cause be severed and put on the non-jury docket. When the court granted defendant's motion for severance after the State presented its evidence, defendant could have made a motion for a jury trial and the trial court in its discretion could have granted it. *People v. Hall* (1986), 114 Ill. 2d 376, 499 N.E.2d 1335.

Defendant cites *People v. Simpson* (1974), 24 Ill. App. 3d 835, 321 N.E.2d 464. However, *Simpson* is factually distinguishable. In *Simpson*, the defendants were forced to choose between having a jury trial while being inadequately prepared or having a bench trial at a later date so the defense could adequately prepare. In this case, defendant was adequately prepared. The trial court continued the case because defendant's initial defense counsel at that time was not prepared. Defendant was not forced to choose between a bench trial over a jury trial. The trial court was adequately aware of the various defenses of the individuals involved. None of the codefendants or defendant presented such actual and substantial antagonistic defenses which would have been prejudicial to defendant. While the cumulative effect in *Simpson* denied the defendants a right to a trial by jury, the cumulative effect in this case did not force defendant to waive a jury trial. A reasonable possibility is that the waiver was a legitimate trial strategy, since counsel knew that defendant's defense was a very technical one and a jury might not fully understand or accept such a defense. Furthermore, defendant has not established how his trial strategy would have differed if severance were granted earlier. (See *People v. Lekas* (1987), 155 Ill. App. 3d 391, 508 N.E.2d 221.) Thus, this court finds the trial court did not abuse its discretion and defendant voluntarily and understandingly waived his right to a jury trial.

In defendant's second and final issue, he claims the trial court denied him a fair trial because the trial court had prejudged the case. The record reveals the following.

At the close of the State's evidence, defendant's counsel moved for mistrial alleging that he had been prevented from questioning Eutha Quilling regarding any rewards or inducement she or her family had been given in exchange for their testimony. As a result, it hindered him in presenting defendant's defense and highly prejudiced defendant. Counsel for the other defendants also moved for mistrial.

When the trial court denied the motions for mistrial, counsel for Patterson requested the court to enter an order restraining the State and any other counsel from mentioning threats or anything else regarding protective custody either in closing argument or elsewhere because it was prejudicial. The State and counsel for defendant objected. At that point, the trial court questioned counsel for defendant

on the benefits of establishing any threats to the Quillings since defendant and the others all have connection with the Disciples street gang. However, the trial court could not see any benefit to defendant's defense theory and that the only party to benefit was the State.

Counsel for defendant and the trial judge then had the following exchange:

"MR. STEGMEYER [counsel for defendant]: Well, let's assume hypothetically that we could develop the defense that Mr. Jerome Dixon, in fact, had withdrawn from any activity or participation in the Disciples as a gang member. Let's assume that, as a matter of fact, he might have been acting as an undercover for the police department because of his feelings about the gang and what they had done. And, therefore, at the time this occurred, he was a participant merely as an undercover man. And if that were developed, then certainly some of the questions that may come out may be pertinent to that defense. That's an assumption. That's purely an assumption. That's one of the problems, your Honor.

THE COURT: Well, the reason I consolidated the cases to begin with was economy with respect to the disposition of these cases, principally with regard to the State's evidence with these events and somewhat bizarre concepts of defense. If Defendant Dixon wants to pursue these pipe dreams individually, I will consider severance and let you present these things later in the week.

MR. STEGMEYER: Well, that—that is and was, you know, one of the thoughts we had as far as his defense was concerned. And I can see it's very antagonistic to the other defenses, your Honor.

THE COURT: That he is an undercover agent?

MR. STEGMEYER: No, not an undercover agent. But, in fact, there could be some evidence that he cooperated with the police in many endeavors that were detrimental to the Disciples. As a matter of fact, he could be called an informant.

THE COURT: Well, I will sever Jerome Dixon on this point. The adjournment of his case will be a little longer than Monday. If the defendant wants the last Quilling witness brought back to pursue that Cahokia versus Roosevelt Homes situation, I will direct the State to bring her back.

MR. STEGMEYER: Thank you, your Honor.

THE COURT: Mr. Hanks, do you have some suggestion before I formalize this ruling?

MR. HANKS: [Assistant State's Attorney]: No, your Honor.

THE COURT: The Court orders Jerome Dixon severed for the balance of the trial. I expect that we will proceed with that case the latter part of next week. Are there any other motions?"

The State claims that defendant's trial counsel made no objection to the court's remarks at the time or in the post-trial motion and thereby waived the issue on appeal and the plain error doctrine would not apply.

██ █ This court agrees that failure to raise an objection during trial or the post-trial motion effectively waives this issue on appeal. As to whether it may be considered under the doctrine of plain error, this court is guided by the standards in *People v. Gacy* (1984), 103 Ill. 2d 1, 468 N.E.2d 1171, and their application in *People v. McDaniels* (1986), 144 Ill. App. 3d 459, 494 N.E.2d 1275. *Gacy* explains the criteria as whether the evidence is closely balanced or if the claimed error is of such a magnitude that the defendant was denied a fair and impartial trial. (103 Ill. 2d at 28, 468 N.E.2d at 181.) *People v. Mc-Daniels* applied the *Gacy* criteria in examining a trial judge's remarks and the context in which they were made, that context including the stage of trial as well as the remarks themselves. Although one may reasonably conclude the instant remarks were unfortunate or ill-advised, we conclude that defendant was not denied a fair and impartial trial by these remarks and that the evidence in this case as a whole was not closely balanced. (*People v. Gacy* (1984), 103 Ill. 2d 1, 468 N.E.d 1171.) Further, we conclude that the situation here is not similar to *People v. McDaniels*.

For the foregoing reasons, this court affirms the judgment of the circuit court of St. Clair County.

Affirmed.

RARICK and CHAPMAN, JJ., concur.