(No. 56448.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. HAROLD BEAN, Appellant.

*Opinion filed October 3, 1985.—Rehearing*
*denied December 2, 1985.*

82

Charles M. Schiedel, Deputy Defender, and Lawrence
J. Essig, Assistant Defender, of the Office of the State

Appellate Defender, of Springfield, for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Mark L. Rotert, Assistant Attorney General, of Chicago, and Joan S. Cherry, Thomas V. Gainer, and Donald M. Devlin, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SIMON delivered the opinion of the court:

Harold Bean, the defendant in this case, was jointly tried in the circuit court of Cook County with codefendant Robert Byron for a variety of crimes connected with the death of Dorothy Polulach on February 17, 1981. Byron and Bean were both convicted of murder, armed robbery, home invasion, and conspiracy, and Bean was also convicted of solicitation. At a special sentencing hearing convened before the same jury (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(d)), Byron and Bean were sentenced to death for the murder of Dorothy Polulach. The sentence was stayed pending Bean's appeal directly to this court. (Ill. Const. 1970, art. VI, sec. 4(b); 87 Ill. 2d R. 603.) Because the circuit judge erroneously refused to grant Bean's motion for severance and his repeated motions for mistrial, we reverse and remand for a new trial.

Wayne Walters testified that during 1979, he lived in Ft. Lauderdale, Florida, with his wife Ann. Her father, George Polulach, had divorced Ann's mother and was living in Chicago with his new wife Dorothy. Ann hated Dorothy, and when George committed suicide in 1979, Ann blamed Dorothy for George's death.

Shortly after George's wake, Ann, Wayne, Ann's friend Geri Smith, and Geri's ex-husband Harold Bean were gathered at Smith's home in Chicago, when Bean suggested that he would kill Dorothy for a monetary re-

ward. The subject next arose in May 1980, when Geri Smith and Harold Bean were visiting the Walters at their home in Florida. In June 1980, Bean flew to Florida to discuss the possibility of Bean's burglarizing Dorothy's home. Wayne Walters believed that Bean was suggesting that he would kill Dorothy.

Robert Egan testified that on February 17, 1981, he, his ex-brother-in-law Byron, and Bean left in Bean's car to burglarize Dorothy Polulach's home. Bean was wearing a priest's smock. Egan dropped Bean and Byron a few blocks from the Polulach home and waited. Byron returned alone, removed a gun hidden under the car seat and left. Egan drove down the street and a few minutes later picked up Bean and Byron. The three returned to Byron's house, where they sorted out jewelry taken from Polulach's home and then left in the car. Bean got out of the car and flung the gun from a bridge into a river. Despite repeated searches, the gun was never found. The next day the three drove to a restaurant where Bean placed the priest disguise in a garbage can.

On February 18, Bean returned to Florida, where, Wayne Walters testified, Bean asked for $10,000 to pay off his partners. Wayne gave Bean $50. On Bean's return Egan and Byron picked Bean up at the airport. They stopped to throw a bag of costume jewelry into a river and, according to Egan, Bean described how he entered Dorothy Polulach's home and handcuffed and shot her. In March, Bean again returned to Florida, where the Walters paid him $5,000 which they borrowed from friends. Egan received $1,300 from Bean.

Dorothy Polulach's body was discovered by a neighbor on February 20. In the course of their investigation, two Chicago police officers flew to Florida to interview the Walters, who gave a statement. Wayne returned to Chicago and was told that charges against him would be reduced for cooperating with the State.

The police then went to Byron's home in Chicago and took him into custody, but he would not admit participation. Byron was eventually released on *habeas corpus*. Byron's ex-wife notified Egan that Byron had been arrested, and Bean and Egan left in a car with Bean's girlfriend, Debra Youngbrandt. She testified that after spending a night in a Chicago hotel, she drove Bean and Egan to Iowa, Missouri, and Nebraska. In Nebraska a local police officer stopped the car for a traffic violation. Egan, who did not have a driver's license, was arrested, and Bean and Youngbrandt left him and returned to Chicago. They abandoned the car in favor of a stolen truck and stolen license plates. Youngbrandt testified that Bean described to her how he killed Dorothy Polulach.

After Youngbrandt returned to Chicago, she gave a statement to the Chicago police which led to the discovery of the hidden truck and to the arrest of Bean, who was hiding in a forest preserve. Byron testified before a grand jury and was arrested as he left the grand jury room.

Before trial, Byron's attorney moved in writing for severance. His main argument was that the evidence against Bean was overwhelming, and that this could not help but be prejudicial to Byron. Byron's defense at trial was an alibi. Two witnesses testified that he was with them until 7 p.m. on the evening of the murder. He noted that no one saw him with Bean and Egan, and that the only evidence against him came from admitted co-conspirators Wayne Walters and Egan and from Youngbrandt, a woman with drug, alcohol, and emotional problems. He claimed that Bean was the murderer and that he, Byron, had never been involved.

Before trial, Bean's attorney orally joined Byron's motion for severance. At the consolidated hearing on the two motions, Bean's attorney stated that Byron's attorney had indicated that Byron's defense would be "an ac-

tual attack" on Bean, all the blame for the murder would be placed on Bean, and that Byron's attorney was planning to "unequivocally attack [Bean] in his opening statement." Bean's attorney argued that this would not be a fair atmosphere in which to try his client. He also requested that the circuit judge grant Bean's motion for severance before the trial and thus avoid the necessity of Bean's moving for a mistrial after the opening statement. The motions for severance were denied and the trial began.

In his opening statement, Byron's counsel repeatedly referred to Bean. He stated that "the innocent remain and the guilty flee," noting that Bean left Illinois, but Byron did not. Bean's objection was overruled, although the trial judge later stated that the statement of Byron's counsel regarding the implications of flight was not an accurate statement of the law. Next, Byron's attorney noted that Byron was a logical choice as a scapegoat, since Bean and Byron had previously served in the penitentiary together. Bean's objection was overruled. Finally, Byron's attorney said,

"His Honor *** told you that the defense need prove nothing in a criminal case. And the defendant need never take the stand, never has to take the stand because the burden of proof is on the State ***.

But Bob Byron is going to take the witness stand. He is going to testify. Because an innocent man can't wait to tell his story. And a guilty man will never take the stand."

Bean's objection was overruled. Again, Byron's attorney said, "The murderer will never take the stand." Once again, Bean's objection was overruled.

Bean's attorney moved for a mistrial based on the "highly prejudicial, antagonistic, and illegal" opening remarks by Byron's counsel. The motion was denied, and the trial court commented, "Now, I don't know if you

and [Byron's counsel] decided you would have [him] do it or not."

During the course of the trial, cross-examination of the State's witnesses by Byron's attorney was highly prejudicial to Bean. Using leading questions, Byron's counsel reiterated the theory that Bean was the murderer and that he perpetrated the crime alone, repeating details of acts which Bean allegedly committed. Byron's counsel not only caused witnesses to repeat testimony detrimental to Bean, but also elicited several new admissions harmful to Bean.

For example, the following colloquy occurred when Byron's counsel cross-examined Wayne Walters:

"Q: Now when you first talked to Harold Bean it was Bean's idea to kill Dorothy, is that right?

A: Yes.

\* \* \*

Q: And you discussed with him in detail how he was going to accomplish this, is that correct?

A: That's correct.

Q: And he told you that he was going to get a disguise, right?

[Bean's counsel]: Your Honor, I am objecting to this.

THE COURT: Overruled.

Q: He told you that he was going to get a disguise, is that correct?

A: That's correct

\* \* \*

Q: And didn't [Bean] say he would rather do it himself because there would be nobody around to testify against him, it is safer that way?

A: Yes, I assume so.

Q: All right. And that after all she was an old woman, wasn't she?

A: Yes.

Q: He didn't need help killing this old lady, did he?"

In the cross-examination of Egan, Byron's counsel further implicated Bean by emphasizing Bean's admis-

sion that he committed murder:

> "Q: Now, the purpose of a criminal wearing a disguise is so that he can't be identified readily by his victims, is that right?
> A: Yes.
> \*\*\*
> Q: You are talking to Harold Bean, right, Harold Bean talking to you, right?
> A: Harold Bean is talking to me, yes, sir.
> Q: He is telling you there is a lot of money, you are going to get a lot of money, right?
> A: Yes, sir.
> \*\*\*
> A. [W]hen Harold Bean first started talking, he made the statement, 'Well, Clutch, you can add another round to our little bag of tricks.' And I stated, 'what is that?' And he said murder."

In his direct examination of Byron, his counsel asked Byron what the police had said to him when he was first questioned:

> "Q: Well, can you remember what they said?
> A: Yeah. They. told me that all I had to do was to— they knew—let me rephrase that again.
> They told me they knew that I wasn't the trigger man. They knew Bean pulled the trigger and killed the woman and they told me all I had to do was just tell them that I was driving the car and that would be all and I would be granted full immunity from any prosecution."

Byron's counsel also cross-examined Joseph Curtin, a Chicago police officer, regarding the potential dangerousness, not of Byron, but of Bean:

> "Q: You were going to arrest Harold Bean, right?
> A: Yes sir.
> Q: And you were expecting trouble, weren't you?
> [Bean's counsel]: Object. Objection to that, Judge.
> THE COURT: You may answer for what it's worth.
> Q: And you were expecting trouble, weren't you?
> A: It's a precaution for the safety of the police offi-

cer.

Q: Right. You were expecting trouble?

\* \* \*

Q: But there's an order armed and considered dangerous, is that not true?

A: If we have information that an offender is armed and considered dangerous, we will put it on a notice.

Q: And such a notice was sent out on Bean, is that correct"

[Bean's counsel]: Objection.

THE COURT: He may answer for what it's worth.

A: Yes, sir."

During the course of the trial, Bean's counsel repeatedly objected to Byron's counsel's attacks on Bean. All such objections were overruled. At the close of the evidence, Bean's motion for a directed verdict, which had been made at the close of the State's evidence, was denied. Bean's counsel then moved for a mistrial on the grounds that the two defendants' defenses were antagonistic, and that as a result of the continuing behavior of Byron's counsel, Bean was being forced to "fight on two fronts," that is, Bean was obliged to rebut the evidence presented by the codefendant as well as by the State. The motion was denied.

During closing argument, Byron's counsel continued his frontal attack on Bean. Byron's counsel stated that Bean never told Wayne or Ann that he needed partners. Bean's objection was overruled. Byron's counsel argued to the jury, "So, here he [Bean] is, a con man, a murderer, and now he becomes an extortionist." Bean's objection was again overruled. A few moments later, his motion for a mistrial was also overruled. Byron's counsel referred to a conversation Bean allegedly had with Geri Smith's son: "He tells Steele you want to make some money. I'm going out to murder somebody. Now, Steele had a conscience." Byron's counsel repeated Egan's testimony that Bean wore a disguise. He stated, "You do

know that Harold Bean went into that house." Byron's counsel argued, as he had in his opening statement, that Egan and Bean ran but Byron did not. Again, he said that the guilty flee. Byron's counsel referred to the "stuff that Harold Bean brought over." Finally, in his most brazen move, Byron's counsel announced dramatically:

> "Now, Dorothy Pululach [sic] was murdered. There's no doubt about that. There's a doubt in my mind—strike that. I don't think there can be any doubt that Harold Bean is the one who killed her."

Bean's repeated objections to this closing argument and his motion for a mistrial were overruled.

In the State's closing rebuttal argument, the State directly attacked both defense counsel, saying:

> "It's a facade. A facade is very like crocodile tears. They don't mean anything. They are effect. They are insincere. They have put on a show for you of being one opposed against the other in the hope that one would create reversible error for the other.
>
> [Both defense counsel object]
>
> THE COURT: Objection sustained about error or anything like that.
>
> They have put on a facade of seeming to be at each other's throats, in the hope that you will get caught up in that."

Bean's objection was overruled. He now claims that the prosecutor's mention of possible reversal at the appellate level, and his suggestion that the two defense attorneys collaborated to engage in improper behavior created reversible error.

After the jury verdicts were returned and the State requested the death penalty for both defendants, a unitary sentencing hearing was held before the same jury. The defendant's objection to the death penalty statute as unconstitutional was overruled, and his motions for a new jury and for a bifurcated hearing on death eligibility

and then mitigation and aggravation were denied. Both Bean and Byron were sentenced to death.

In this court, the defendant raises a large number of errors which he believes require reversal of his conviction and several more errors which he contends require us to vacate the sentence of death in the event that the conviction is upheld. It is only necessary for us to address three interrelated issues, the denial of the defendant's motion for severance, the denial of his repeated motions for a mistrial and/or for severance once the trial had begun, and the prosecutor's remarks during closing arguments. All three questions reduce to the same irremediable error. The comments by codefendant's counsel upon this defendant's failure to testify in his own behalf were prejudicial to his right to avoid self-incrimination under the fifth amendment to the Constitution of the United States, as applied to the State of Illinois through the fourteenth amendment. Byron's defense strategy was hopelessly antagonistic to Bean's constitutional rights. For this reason, the two should have been separately tried.

A defendant does not have an automatic right in Illinois to be tried separately from his codefendants simply because they were all charged in the same indictment for crimes arising from the same circumstances. (*People v. Ruiz* (1982), 94 Ill. 2d 245, 257.) " 'The general rule is that defendants jointly indicted are to be jointly tried *unless fairness to one of the defendants* requires a separate trial to avoid prejudice.' " (Emphasis added.) *People v. Daugherty* (1984), 102 Ill. 2d 533, 541, quoting *People v. Lee* (1981), 87 Ill. 2d 182, 187.

A defendant who does not wish to be jointly tried may file a pretrial motion for severance (Ill. Rev. Stat. 1981, ch. 38, par. 114—8). Mere apprehensions of prejudice are not enough. The motion must state how the defendant would be prejudiced by a joint trial. (*People v.*

*Daugherty* (1984), 102 Ill. 2d 533, 541; *People v. Lee* (1981), 87 Ill. 2d 182, 186; *People v. Braune* (1936), 363 Ill. 551, 554.) The decision whether to grant the motion is discretionary with the trial judge, and will not be reversed absent an abuse of discretion. *People v. Daugherty* (1984), 102 Ill. 2d 533, 541; *People v. Canaday* (1971), 49 Ill. 2d 416, 424.

In this case the State argues that the circuit judge acted appropriately to cure any potential prejudice by deleting any references to Bean in Byron's pretrial statements. However, this only solved part of the problem. Two independent sources of potential prejudice are each likely to require that jointly indicted defendants be separately tried. The first is interference with the constitutionally guaranteed right of confrontation. (*Bruton v. United States* (1968), 391 U.S. 123, 134 n.10, 20 L. Ed. 2d 476, 484 n.10, 88 S. Ct. 1620, 1626-27, n.10.) This problem is cured either by severance or by the action taken by the trial judge in this case, removal of all references to the moving defendant. (*People v. Daugherty* (1984), 102 Ill. 2d 533, 541-42; *People v. Clark* (1959), 17 Ill. 2d 486, 490.) Removal of the names, however, does not address the second issue, that of antagonistic defenses.

Illinois recognizes that when codefendants' defenses are so antagonistic to each other that one of the codefendants cannot receive a fair trial jointly with the others, severance is required. (*People v. Daugherty* (1984), 102 Ill. 2d 533, 541-42; *People v. Gendron* (1968), 41 Ill. 2d 351, 356-57; *People v. Wilson* (1963), 29 Ill. 2d 82, 91; *People v. Braune* (1936), 363 Ill. 551.) Actual hostility between the two defenses is required (*People v. Daugherty* (1984), 102 Ill. 2d 533, 542; *People v. Lee* (1981), 87 Ill. 2d 182, 188.) Here Bean alleges that Byron's strategy of comparing Byron's willingness to testify to Bean's unwillingness to take the stand de-

prived Bean of his fifth amendment right to remain silent and thus prevented him from receiving a fair trial. In addition, Byron's trial strategy of depicting Bean as the "murderer" and of producing testimony damaging to Bean which was not elicited by the State from its own witnesses unfairly placed Bean in the position of having to defend against two accusers, the State and his codefendant. See *People v. Braune* (1936), 363 Ill. 551.

On its facts, this case is more similar to *People v. Daugherty* and *People v. Braune*, cases in which this court determined that severance was warranted, than it is like cases in which severance was held to be unnecessary. In both *Daugherty* and *Braune* the trial became more of a contest between the defendants than between the State and an individual defendant. That is also the case here, and it is an unacceptable situation.

In *Braune*, the fountainhead of this State's jurisprudence in this area, the defendant was found guilty of manslaughter. Prior to trial, he filed a verified petition for severance, alleging that the two defendants' defenses were diametrically conflicting and antagonistic. Subsequently the other defendant filed a petition alleging that the first defendant would testify, and that the second defendant would be disadvantaged by being unable to cross-examine him; this motion was also denied. This court was especially concerned that one of the defendants, through cross-examination, brought out facts harmful to the other, just as occurred in this case. The court noted that "[i]t is our belief that no judge, however learned and skillful, could have protected the defendants in this case against their own hostility." (*People v. Braune* (1936), 363 Ill. 551, 556.) Again, "the trial was in many respects more of a contest between the defendants than between the People and the defendants. It produced a spectacle where the People frequently stood by and witnessed a combat in which the defendants at-

tempted to destroy each other. Any set of circumstances which is sufficient to deprive a defendant of a fair trial if tried jointly with another is sufficient to require a separate trial. [Citation.]" 363 Ill. 551, 557. See also *State v. Clarke* (R.I. 1982), 448 A.2d 1208, 1210.

In this case, the People stood by while Byron's attorney tried repeatedly, in his opening statement, in his cross-examination of various witnesses, and in his closing argument, to destroy Bean's case. Byron's defense was that Bean was the murderer. He could only convince the jury of his own innocence by convincing them to convict Bean. Obviously, this strategy resulted in irreparable prejudice to Bean and could only have been avoided by the mechanism of a separate trial.

In *People v. Daugherty* (1984), 102 Ill. 2d 533, each of the two codefendants made a statement that he was present at the scene of the crime, but blaming the victim's death on the other. As in this case, the trial judge ordered the names stricken from the statements. However, that did not solve the problem of antagonistic defenses, and this court held that severance was the proper remedy.

We are not persuaded by the People's arguments that *Braune* and *Daugherty* do not control because the defenses in this case are not antagonistic in the sense that the two defendants are reciprocally blaming the other. The People state that since Byron's defense was an alibi, and since Bean did not say "I didn't do it, he did," that the two defenses are compatible, and severance was not required. This reasoning is specious. As the above quotation from *Braune* illustrates, *any* set of circumstances which deprives *a* defendant of a fair trial is sufficient to require severance. There is no requirement that the prejudice must be symmetrical. (See generally *People v. Rose* (1932), 348 Ill. 214 (error to deny motion for severance where codefendant claimed he was not present during

shooting and defendant did not testify), and *State v. Clarke* (R.I. 1982), 448 A.2d 1208, 1210.) How can it be permissible to deprive one defendant of his constitutional rights on the ground that no harm is done to the *other* defendant?

This case is distinguishable from *People v. Lee* (1981), 87 Ill. 2d 182, in which this court held that severance was not required because the defendant's claim that he would be prejudiced by a joint trial was never made specific. The defendant in *Lee* moved for severance on the ground that a codefendant had made statements incriminating him, and also on the ground that one of the codefendants would mount an antagonistic defense by taking the stand and implicating the moving defendant. The motion was denied on the ground that there was only a possibility of antagonistic defenses. Even when the motion was renewed after the codefendant testified, the defendant never detailed the antagonism. The court believed that the codefendant's testimony that the defendant forced him to shoot the victim was not entirely antagonistic to the other defense.

The situation in this case is different. Here, the codefendant's counsel specifically commented upon the defendant's refusal to testify, violating both the fifth and fourteenth amendments and an Illinois statute (Ill. Rev. Stat. 1981, ch. 38, par. 155—1). Defense counsel explained that Bean's right to avoid self-incrimination was being infringed. In addition, Byron's defense was clearly entirely antagonistic to Bean's. In a word, Byron's defense consisted of the contention that Bean was the murderer and Byron was not even there. Byron's counsel elicited admissions from witnesses which implicated Bean and were totally irrelevant to Byron. Finally, Byron's closing argument labeled Bean as a murderer. Unlike the situation in *Lee*, the motions for severance and mistrial were sufficiently specific to put the trial

judge on notice that Bean's constitutional and statutory rights would be violated if he were tried jointly with Bean.

The fifth amendment protects individuals from self-incrimination. As a result, a criminal defendant cannot be compelled to testify against himself. In a criminal prosecution, the burden of proof is on the State. It is elemental that the accused need not testify in his own behalf; the accused need present no evidence at all. The trial judge and the prosecution are forbidden to comment upon the accused's failure to take the stand. (*Fontaine v. California* (1968), 390 U.S. 593, 20 L. Ed. 2d 154, 88 S. Ct. 1229; *Griffin v. California* (1965), 380 U.S. 609, 14 L. Ed. 2d 106, 85 S. Ct. 1229.) Allowing the jury to draw negative inferences from an accused's exercise of the privilege against self-incrimination would render the privilege meaningless. In *People v. Wollenberg* (1967), 37 Ill. 2d 480, this court reversed a conviction for precisely this reason. Far from emphasizing the defendant's failure to take the witness stand as the codefendant's counsel did in this case, the prosecutor in *Wollenberg* merely stated during closing argument: "There was [*sic*] only eight witnesses in this case. No one else testified in this case [list of witnesses by name]. On behalf of the defendant, just two witnesses [names]. No one else testified. Let's get that straight." (37 Ill. 2d 480, 487.) The court held that this was a violation of section 6 of division XIII of the Criminal Code of 1874 (Ill. Rev. Stat. 1963, ch. 38, par. 734) (now Ill. Rev. Stat. 1981, ch. 38, par. 155—1), and also a violation of the principle of *Griffin v. California*. This court characterized the prosecutor's comments as an express reference to the defendant's failure to testify, and labeled it as plain error because it allowed the State to accomplish by inference what it could not do directly—comment on the accused's failure to take the stand. 37 Ill. 2d 480, 488.

We are persuaded by the reasoning of *De Luna v. United States* (5th Cir. 1962), 308 F.2d 140, a case similar to this one. In *De Luna*, two defendants were indicted and jointly tried on a variety of drug charges. Before trial, the codefendant's motion for severance was denied. The codefendant's attorney commented upon De Luna's failure to testify in his own behalf. The codefendant was acquitted, and De Luna was convicted. On appeal, De Luna contended that he should have been tried separately because his right against self-incrimination was impermissibly infringed by the codefendant's strategy during the joint trial.

The *De Luna* court relied on Supreme Court cases forbidding self-incrimination and concluded that comment from a codefendant's attorney might be even more harmful than comment by the judge or prosecutor. Unlike the court in this case, the trial judge in *De Luna* instructed the jury to disregard counsel's remarks, but the court determined that the instruction was too little too late: "But considering the head-on collision between the two defendants, the repetition of the comments, and the extended colloquy over the comments between the trial judge and the lawyers, the imputation of guilt to de Luna was magnified to such an extent that it seems unrealistic to think any instruction to the jury could undo the prejudicial effects of the reference to de Luna's silence. The seed of inference was so well planted, it is fair to assume that it germinated." (308 F.2d 140, 154-55.) *Cf. People v. Haldeen* (1968), 267 Cal. App. 2d 478, 73 Cal. Rptr. 102 (trial judge granted new trial because his admonition to the jury regarding comments by codefendant's counsel actually compounded the problem).

Similarly, in this case, codefendant's counsel drew attention to his remarks by specifically pointing out that even though the judge would instruct the jury that they should not draw inferences from the defendant's failure

to testify, he wished to mention it anyway. This comment completely destroyed any protection provided by the fifth amendment: "[T]he 'privilege against self-incrimination would be reduced to a hollow mockery if its exercise could be taken as equivalent either to a confession of guilt or a conclusive presumption of perjury'." *De Luna v. United States* (5th Cir. 1962), 308 F. 2d 140, 151, quoting *Slochower v. Board of Higher Education* (1956), 350 U.S. 551, 557, 100 L. Ed. 692, 700, 76 S. Ct. 637, 641.

Bean's defense counsel repeatedly objected to this type of comment, and the judge made several pointed remarks. The jury's attention could not help but be drawn to the situation, and no instruction could undo the harm done by the impermissible erosion of the defendant's right against self-incrimination. The seed of incrimination in this case was planted during opening statements, nurtured by the codefendant's counsel's detrimental cross-examination of various prosecution witnesses, and fertilized by the closing arguments of both the codefendant's counsel and the prosecutor. Here, as in *De Luna*, it is fair to assume that the seed germinated and resulted in a trial unfair to this defendant.

Also, as in *De Luna*, we point out that it is an advocate's duty to represent his client as vigorously as possible within the bounds of the code of ethics. Byron's counsel believed that he could best represent his client by contrasting the behavior of the two defendants. Byron, like Bean, was entitled to the best defense available, and Byron's counsel was duty bound to use the strategy most likely to achieve a just and fair result for his client. On the other hand, Bean's counsel was bound to assure a fair result for his client by protecting Bean's right against self-incrimination. The two defense strategies inexorably clashed. Severance was the only solution, the only way in which both counsel could fulfill their duties to their respective clients without at the same time

violating Bean's constitutional rights.

We do not decide the merits of this motion for severance based on subsequent events during the trial. (*People v. Daugherty* (1984), 102 Ill. 2d 533, 545, *People v. Yonder* (1969), 44 Ill. 2d 376, 386.) However, as in *Daugherty*, we use later events to illustrate the prejudice which results when the motion for severance is not granted at the earliest possible point. (*People v. Daugherty* (1984), 102 Ill. 2d 533, 545.) Further, we reject the State's argument that any error was harmless because counsel's remarks occurred during opening statements rather than closing arguments. According to the State, the defendant could have vitiated any negative inferences by testifying in his own behalf. This argument begs the question. The defendant has a right not to testify at all. If he can be manipulated via his codefendant's opening statement into giving up that right, the "right" has no real meaning.

In addition to the constitutional problem, it is significant to note that an Illinois statute forbids any comment upon an accused's failure to testify in his own behalf. Section 6 of division XIII of the Criminal Code of 1874 reads, in pertinent part, "the person's neglect to testify shall not create any presumption against the person, *nor shall the court permit any reference or comment* to be made to or upon such neglect." (Emphasis added.) (Ill. Rev. Stat. 1981, ch. 38, par. 155—1.) The statute is not limited to comments by prosecutors or by the trial judge. It prohibits "any reference." The statute here was violated when reference was made by Byron's counsel to Bean's failure to testify and when the court permitted him to refer to and comment on Bean's failure to testify. This, of course, does not preclude questions asked by the trial judge during *voir dire* at the request of the defendant pursuant to *People v. Zehr* (1984), 103 Ill. 2d 472.

We cannot, for the reasons stated above, conclude

that the trial court's error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824.) Moreover, as we have already pointed out, the only evidence against Bean was the testimony of co-conspirators Byron, Egan and Wayne Walters and that of Youngbrandt, whose credibility was questionable in view of her drug, alcohol and emotional problems. The jury obviously did not believe Byron's claim that he had never been involved and that Bean alone was the murderer. There was no corroboration of Egan's testimony that he was with Bean and Byron. It is impossible, therefore, to ascertain how the jury would have evaluated Bean had he not been the object of the improper attacks by Byron's counsel. The trial judge abused his discretion by failing to grant the motion for a mistrial at the earliest possible moment, which, at the latest, was when the motion for mistrial was made during opening argument. For this reason, the defendant's conviction must be reversed.

Finally, we note that the prosecutor's rebuttal closing argument introduced additional error into the record. The prosecutor's suggestion that Byron's trial strategy was a subterfuge deliberately calculated to introduce reversible error unfairly, and without any basis for doing so, discredited Bean's attorney. A defendant is entitled to be tried by an unbiased jury and to be judged on the merits of his case, not on the unsubstantiated personal opinion which the prosecutor holds of the defense attorney's ethics and abilities. The prosecutor's accusation of defense trickery substantially prejudiced the defendant's right to a fair trial and was improper. *People v. Weathers* (1975), 62 Ill. 2d 114; *People v. Stock* (1974), 56 Ill. 2d 461; see also *People v. Clark* (1983), 114 Ill. App. 3d 252; *People v. Brown* (1983), 113 Ill. App. 3d 625.

While we find additional errors in the record of this trial and sentencing hearing, our disposition of the case

renders it unnecessary for us to discuss these. The judgment of the circuit court of Cook County is reversed, and the cause is remanded for a new trial.

*Reversed and remanded.*