THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
PRESTON ADAMS, Defendant-Appellant.

First District (4th Division)   No. 1—86—3131

Opinion filed November 10, 1988.

Robert E. Pincham, Jr., and Michael B. Lebman, both of Robert E. Pincham, Jr., Ltd. & Associates, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Inge Fryklund, Patricia Y. Brown, and Joseph G. Laspisa, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE JIGANTI delivered the opinion of the court:

The defendant, Preston Adams, along with codefendants Lindsay Cannon and Andre Johnson were jointly indicted on charges of murder and conspiracy to commit murder. Prior to trial, Preston Adams moved for severance. This motion was denied. Following a jury trial, Preston Adams and codefendant Andre Johnson were found guilty of conspiracy to commit murder and not guilty of murder. Codefendant Cannon was found guilty of both murder and conspiracy to commit murder.

On appeal, the defendant Preston Adams argues: (1) that the trial court erred in failing to sever the trial; and (2) that the trial court erred in refusing to give a tendered jury instruction on withdrawal.

At trial, the State's evidence essentially consisted of signed court-reported statements made by Adams, Cannon and Johnson, who were all members of a street gang called the Disciples. Adams' statement established the following.

On October 6, 1984, Adams met Cannon and Johnson at the house of a man named Archie Adams. They talked about going to a residential building at 2051 West Lake Street. Preston Adams characterized 2051 West Lake Street as the "Vice Lords building" and stated that they were going there to "get some Vice Lords who had shot at them earlier" that day.

That evening, Adams, Cannon and Johnson went to 2051 West Lake Street. Adams carried a .38 caliber revolver, Cannon carried a

.22 caliber rifle, and Johnson carried an umbrella. When they got inside the building, Adams and Johnson separated from Lindsay Cannon. After looking around and not finding "the guys who had shot at us earlier," Adams and Johnson left the building. Once outside the building, they got into an argument because Johnson wanted the gun to go back inside the building. As Johnson raised the umbrella to attack Adams, Lindsay Cannon, who had just come out of the building, came in between them and kept them apart. Seconds later, someone yelled, "Vice Lords" and started shooting at the three of them. Adams and Cannon "both turned around and returned fire." Adams fired five shots with the .38 caliber gun which he carried. After returning fire, all of them ran to another building.

The court-reported statements of Cannon and Johnson gave the same account of the events of October 6, 1984, except for one discrepancy. Adams stated that they went to 2051 West Lake Street to "get some Vice Lords who had shot at them earlier" that day. Later in his statement, Adams stated that they were looking for "the guys who had shot at us" earlier. In his court-reported statement, Cannon stated that they went to 2051 West Lake Street to "get even with some boys that shot at [Adams] during the day." Johnson also stated that a member of the Vice Lords shot at Adams earlier that day.

Undisputed testimony at trial established that one of the shots fired by Cannon's gun fatally wounded Edward Barrow, who was on his way to visit his mother in the 2051 West Lake Street building. Barrow was not a member of any gangs.

Adams was the only defendant to testify at trial. On direct examination, Adams stated that not all of his court-reported statement was true. Adams testified that on October 6, 1984, he was standing outside his girlfriend's apartment when Cannon and Johnson approached him. Johnson told him they were going to 2051 West Lake Street because someone owed him money. Cannon was "hunching on me and everything" and when Adams saw the .22 caliber rifle which Cannon was carrying, Adams got the impression that if he did not go with them something might happen to him.

Adams also denied on direct examination that he possessed or fired a .38 caliber revolver at 2051 West Lake Street. However, on cross-examination, he admitted that he fired five shots with the .38 caliber revolver at the 2051 West Lake Street building.

Adams also alleged that it was the codefendants who told him to make the inculpatory statements in his confession and he followed their orders because he feared for his life or the lives of his family. However, on cross-examination, Adams testified that he was never

threatened verbally or physically by either Cannon or Johnson regarding testimony at trial.

Adams' first contention on appeal is that the trial court erred in failing to sever the trial. Adams' primary basis for this contention is that his defense is antagonistic to that of the codefendants. Adams' defense was that he did not voluntarily participate in the conspiracy.

■ A defendant does not have an automatic right to be tried separately from his codefendants simply because they were all charged in the same indictment for crimes arising from the same circumstances. (*People v. Bean* (1985), 109 Ill. 2d 80, 92, 485 N.E.2d 349, 354.) However, when codefendants' defenses are so antagonistic to each other that one of the codefendants cannot receive a fair trial jointly with the others, severance is required. (*People v. Daugherty* (1984), 102 Ill. 2d 533, 542, 468 N.E.2d 969, 973.) The decision whether to grant a motion to sever is discretionary with the trial court and will not be reversed absent an abuse of discretion. *Bean,* 109 Ill. 2d at 93, 485 N.E.2d at 355.

We fail to see how the defenses of Cannon and Johnson were so antagonistic that Adams was deprived of a fair trial. The court-reported statements of Adams and codefendants Cannon and Johnson were essentially the same. Each statement stated that on October 6, 1984, Adams, Cannon and Johnson met at Archie Adams' house and discussed going to 2051 West Lake Street to "get" or "get even" with members of the Vice Lords who had shot at one of them earlier that day. All three statements further indicated that before going to 2051 West Lake Street, Cannon armed himself with a .22 caliber rifle, Adams armed himself with a .38 caliber revolver and Johnson carried an umbrella.

At trial, Adams' defense was that he was not voluntarily present at 2051 West Lake Street. He testified that not all of his court-reported statement was true. According to Adams' testimony at trial, Cannon and Johnson approached him outside of his girlfriend's house and forced him to accompany them. Adams also claimed that he did not have a .38 caliber revolver; however, on cross-examination, he admitted that he did use a .38 caliber revolver to fire five shots at 2051 West Lake Street.

■ To be considered antagonistic defenses, there must be a true conflict such that each defendant condemns the other but professes his own innocence. (*People v. Fort* (1986), 147 Ill. App. 3d 14, 21, 497 N.E.2d 416, 421.) Actual hostility is required. (*People v. Bean* (1985), 109 Ill. 2d 80, 93, 485 N.E.2d 349, 355.) Neither Cannon nor Johnson testified. The statements they gave do not profess their innocence and

place the blame on the defendant. The fact that Adams' defense of involuntary participation was, as Adams described it in his appellate brief, clouded by statements of Cannon and Johnson (appellant's brief at 11) does not constitute actual hostility. This is not a case where Cannon and Johnson could only convince the jury of their innocence by convincing them to convict Preston Adams.

■ We are also not persuaded by Adams' characterization of the joint trial as akin to the unacceptable situation in *Bean,* where the trial became "more of a contest between the defendants than between the State and an individual defendant." (*Bean,* 109 Ill. 2d at 94, 485 N.E.2d at 355.) In *Bean,* defendant Bean and codefendant Robert Byron were tried together for a variety of crimes connected with a death. Defendant moved for severance, which was denied. In his opening statement, counsel for Byron repeatedly referred to defendant. Counsel stated: " 'Bob Byron is going to take the witness stand. He is going to testify. Because an innocent man can't wait to tell his story. And a guilty man will never take the stand.' " (109 Ill. 2d at 87, 485 N.E.2d at 352.) Counsel's attacks continued during cross-examination and closing argument as well.

In the instant case, Adams points out that Johnson's counsel cross-examined Adams for 75 pages while the State cross-examined for only 39 pages (appellant's brief at 13). This does not convince us that Adams was placed in the untenable position of defending himself against both the State and the codefendants. (*Fort,* 147 Ill. App. 3d at 21, 497 N.E.2d at 421.) Nor does Adams cite instances where the attorneys for Cannon and Johnson repeatedly tried to destroy Adams' case.

For the foregoing reasons, we do not believe that the trial court abused its discretion in refusing to sever the trial on the grounds of antagonistic defenses.

Regarding the denial of severance, Adams also argues that "when one or more of the codefendants have made prior statements implicating the defendant the failure of the codefendants to testify extremely prejudices the defendant by denying the defendant the right of cross-examination." Appellant's brief at 9, citing *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620.

■ As stated above, the general rule is that defendants jointly indicted are to be jointly tried unless fairness to one of the defendants requires a separate trial to avoid prejudice. *Bean,* 109 Ill. 2d at 92, 485 N.E.2d at 355.

■ Adams essentially argues that he was prejudiced because the codefendants did not testify and he could not cross-examine their

statements. This conclusion that this was prejudicial is based on the defendant's contention that he testified at trial in a manner that contradicted the statements.

This contention is without merit. All three statements essentially state that Adams and codefendants Cannon and Johnson met at Archie Adams' house, where they discussed going to 2051 West Lake Street to "get" or "get even with" members of the Vice Lords who shot at one of them earlier that day. The statements also state that Cannon had a .22 caliber rifle which he shot, Adams had a .38 caliber revolver which he shot, and Johnson carried an umbrella.

At trial, Adams admitted that he went to 2051 West Lake Street and fired five times with a .38 caliber revolver at 2051 West Lake Street. This testimony does not contradict the statements; rather, it gives an explanation for his action. Adams is not trying to avoid his confession. He does not deny his participation, but consistent with his defense, Adams testified that although he went to 2051 West Lake Street, he did not go voluntarily. The statements of codefendants Cannon and Johnson which are the same as Adams' statement do not speak to Adams' assertion that he did not go voluntarily. Nor do the statements of the codefendants implicate Adams and exonerate themselves. They do not implicate Adams any more than Adams implicates himself at trial. Adams fails to explain how he is prejudiced when he testifies to essentially the same facts as to those that were in the statements.

Adams argues that there is prejudice because he squarely places the blame on Cannon and Johnson. This may be prejudicial to Cannon and Johnson but does not address the prejudice to Adams.

There is one aspect of Adams' testimony which differs from his statement as well as the statement of the codefendants. At trial, the defendant stated that contrary to his statement, he did not meet the others at Archie Adams' house but that Cannon and Johnson approached Adams outside of his girlfriend's house. We believe that this is a minor discrepancy and does not establish Adams' contention that his trial testimony contradicted the court reporter's statements.

Therefore, we believe that because there was no prejudice, the trial court did not err in severing the trial on confrontational grounds.

The defendant's final contention is that the trial court erred in refusing to give tendered Illinois Pattern Jury Instructions, Criminal, No. 5.03 (2d ed. 1981) where there was some evidence that Adams withdrew from the conspiracy.

■ The defendant was convicted of conspiracy to commit murder. The defendant cites no case nor are we aware of any case which

states that withdrawal is an affirmative defense to the crime of conspiracy. The traditional rule is that since the crime of conspiracy is complete with the agreement and an overt act, no subsequent action can exonerate the conspirator of that crime. (2 W. LaFave & A. Scott, Substantive Criminal Law §6.5(f), at 110 (1986); see also *People v. Harvey* (1981), 95 Ill. App. 3d 992, 1003, 420 N.E.2d 645, 653 (concerning a conviction of solicitation to commit murder ("[o]nce the evidence establishes that the essential elements of the offense have occurred, it follows that there can be no withdrawal from a completed offense")); *United States v. Read* (7th Cir. 1981), 658 F.2d 1225, 1233 ("[w]ithdrawal is not *** a complete defense to the crime of conspiracy").) In the instant case, there is evidence of an agreement: the defendant and his codefendants discussed going to 2051 West Lake Street to "get" or "get even" with a member of the Vice Lords. There is also evidence of an overt act: the defendant and his codefendants armed themselves and went to 2051 West Lake Street to find a member of the Vice Lords. Because there was evidence establishing the essential elements of conspiracy, it was not error for the trial court to refuse to give tendered jury instruction No. 5.03.

For the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.

LINN and JOHNSON, JJ., concur.