THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JODY CROSE, Defendant-Appellant.—THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ABEL GARZA, Defendant-Appellant.

First District (5th Division) Nos. 1—87—1470, 1—87—1472 cons.

Opinion filed January 19, 1990.

Michael J. Pelletier and Linda Eigner, both of State Appellate Defender's Office, of Chicago, for appellant Jody Crose.

Randolph N. Stone, Public Defender, of Chicago (Mark H. Kusatzky and Aaron L. Meyers, Assistant Public Defenders, of counsel), for appellant Abel Garza.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund and Linda Woloshin, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MURRAY delivered the opinion of the court:

After a joint bench trial, defendants Jody Crose and Abel Garza were convicted of delivery of a controlled substance (Ill. Rev. Stat. 1985, ch. 56½, par. 1401(a)(2)), and each sentenced to six years' imprisonment. (Crose's and Garza's cases were severed from that of a

third defendant, Carl Tatman, who had been convicted of narcotic trafficking in Georgia.) Both defendants seek a reversal of their convictions. For the reasons set forth below, we affirm.

Pursuant to the State's witnesses at trial, two agents of the Vermilion County Metropolitan Enforcement Group (MEG), Patty Cavalenes and Kathy Shappaugh, met Carl Tatman in Urbana, Illinois, on June 19, 1985, for the purpose of going to a Chicago suburb to buy four ounces of cocaine. Tatman and another man named Steve Coverell got into the agents' undercover van, and they drove to their ultimate destination, Casey's Tavern in Sauk Village, Illinois.

While in Casey's parking lot, Tatman pointed to an individual later identified as defendant Crose, who was apparently standing nearby, and stated that he was "the source." Thereafter, Tatman left the van, walked over to Crose, talked with him, and then brought him to the van and introduced him to the agents. Tatman stated to the agents that only one of them could go with him and Crose to buy the cocaine. Everyone then went into the tavern. Tatman and Crose left to make a telephone call from a pay phone. When they returned, Tatman told the agents that his source did not yet have the cocaine, but that they should take the source their money because he would have the cocaine in a half hour. Tatman, Crose and the agents then drove to defendant Abel Garza's home, the directions to which were supplied by Crose. Tatman, Crose and Agent Cavalenes entered the house; Agent Shappaugh remained in the van. In Garza's kitchen, Cavalenes gave $8,400 to Tatman, who showed it to Garza and then returned it to her. Tatman, Crose and Cavalenes then left Garza's house, and the agents and defendants drove back to Casey's Tavern. During the trip, Crose asked Cavalenes how long it would take her to sell the cocaine she was buying. Cavalenes stated it would take about one week.

One half hour after they arrived at Casey's, Crose received a telephone call and thereafter related that "the source" had the cocaine. Tatman, Crose and the two agents returned to Garza's home; Agent Shappaugh again remained in the van while the others entered the house. The parties met with Garza in his kitchen. He stated that he only had two ounces of cocaine and that the agents would have to wait for the other two ounces. Tatman asked Garza to get the two ounces he had, whereupon Garza left the room and returned with a plastic bag containing white powder. Garza handed the bag to Tatman, and Tatman handed it to Cavalenes. After Tatman stated he wanted to sample the contents, Cavalenes reached into her handbag and activated an alert signal to surveillance units in the area. Tat-

man and Garza were placed under arrest in the kitchen, while Crose, who had been standing in the doorway of the back door of the house, was yanked out of the house by another agent and arrested. Agent Cavalenes conducted a field test on the white powder given to her, initialed and dated the bag, and gave it to another MEG agent. The white powder was later determined to be cocaine. A grinder, glass mirror, and a gun missing its barrel were later discovered by the police in Garza's home.

At trial, Agent Cavalenes also specifically testified that she could not recall if Garza stated the cocaine was going to specific individuals or not; she wrote in her report that Garza said he would sell to Crose and Tatman, who would then sell to her; she never talked to Garza about the price; and she did not hand Garza any money. David Zarbock, a State police officer, corroborated Cavalenes' version of the events leading up to defendants' arrests. He also testified that the day after the arrests, he delivered the plastic bag containing the white powder to Lynn Pora at the State Police Forensic Laboratory in Maywood, Illinois. Pora subsequently testified, over the objection of defendants challenging her qualifications to testify as an expert, that the white powder contained synthetic cocaine and weighed 54.1 grams.

Defendant Crose testified that he was outside of Garza's kitchen when he was arrested, he had never been arrested before, he knew that Cavalenes "was there that night to purchase cocaine," he had given the agents directions to Garza's house, he had received a telephone call from Garza at Casey's Tavern and related to Tatman that the cocaine was ready, he did not see Cavalenes show her money to Garza, he did not see anything delivered to Cavalenes, and he was not going to receive any benefit from his participation in the alleged transaction. On cross-examination, when the prosecutor "informed" Crose that his "job that night was to hookup Agent Cavalenes and Tatman with Abel Garza," he replied, "Yes, sir"; he was Tatman's "connect." Upon the prosecutor's further statement to Crose that "You were the intermediary party whose job it was to facilitate the sale of cocaine," Crose answered in the affirmative. Crose also testified that Tatman had requested that he check to see if he could locate some cocaine for him, that he did not know exactly where to go, but he knew "where to look," and that Tatman called him repeatedly and "kept pestering" him.

Defendant Garza testified that he did not hand Cavalenes a "slipper" containing white powder, but that he handed it to Tatman and that he never saw Cavalenes touch it. On cross-examination, he ad-

mitted Tatman, Crose and Cavalenes were at his home to get cocaine, but he denied that he was to sell cocaine to Cavalenes or that she showed him any money. Garza also stated that money was never discussed; he got the cocaine from his supplier; he mixed the cocaine with another substance that he had; when Tatman, Crose and Cavalenes came to his house the second time he got the cocaine from his bedroom; and that Cavalenes was in his kitchen when he handed the cocaine to Tatman.

The trial court subsequently found both defendants guilty of delivery of a controlled substance and sentenced them each to six years' imprisonment. These consolidated appeals followed.

## I

Defendant Crose argues on appeal that the trial court's denial of his motion to produce an informant deprived him of his constitutional rights to confront witnesses against him and to prepare his defense, he was denied effective assistance of counsel, and the trial court erred in allowing the State's "chemist" to testify as an expert. Crose's first argument, that the trial court improperly denied his motion to produce an informant is based on the following facts. On the day of trial, before hearing testimony, the trial court asked the State to clarify the role of an individual named Jacqueline Grant, whose name had apparently surfaced on reports of an uncharged transaction involving Grant and Tatman. The State subsequently disclosed that Grant was a citizen working for the MEG. Defense counsel informed the court that Grant's name was surfacing for the first time and that information concerning her role in the drug transaction resulting in Crose's arrest would be important to an entrapment defense. The court responded that it would allow defense counsel great latitude to make inquiries on cross-examination. Defense counsel argued, however, that the court's approach would not adequately address the problem and pointed out that an uninformed cross-examination could open up areas the defense might not knowingly have chosen to explore. Accordingly, defense counsel objected to commencement of the trial and moved that the court order the State to produce the newly revealed informant. The court denied the motion, stating that it was not sure that Grant had "any real materiality or relevance in the case." The court did, however, invite defense counsel to renew the motion later on in the case once the facts and any potential relevance Grant might have in the case became more clear. Crose's counsel never renewed the motion.

■■ It is well settled that strong public policy reasons favoring

nondisclosure of an informant must be balanced against a defendant's need for disclosure in order to prepare his defense (*People v. Stoica* (1987), 163 Ill. App. 3d 660) or where disclosure is essential to a fair determination of a cause (*Roviaro v. United States* (1957), 353 U.S. 53, 1 L. Ed. 2d 639, 77 S. Ct. 623). Whatever the circumstances, however, a defendant has the burden of showing a need for disclosure. *People v. Stoica* (1987), 163 Ill. App. 3d 660.

In the instant case, Crose relies on a number of cases in support of his argument that the trial court should have required the State to produce Grant (see *People v. Raess* (1986), 146 Ill. App. 3d 384; *People v. Coleman* (1984), 124 Ill. App. 3d 597; *People v. Castro* (1973), 10 Ill. App. 3d 1078; *Roviaro v. United States* (1957), 353 U.S. 53, 1 L. Ed. 2d 639, 77 S. Ct. 623). Those cases are distinguishable, however, because they, unlike the situation before us, involved informants who played an active role in the criminal occurrence by either participating in or witnessing the crime. For example, in *Raess*, an unnamed informant approached the defendant, initiated conversations about narcotics and persistently appealed by telephone and in person that the defendant procure cocaine from him and his partner. The *Raess* court determined that disclosure of the informant was necessary because he had over a period spanning three weeks "played a prominent, if not pivotal, role in laying the groundwork for the offense and, possibly, in inducing defendant to commit it." (*Raess*, 146 Ill. App. 3d at 392.) In *Coleman*, the informant tipped the police that the defendant was selling drugs and also witnessed the defendant's activities forming the basis for the drug-related charges. The informant, therefore, was the only witness who could corroborate or rebut the State's evidence of the defendant's possession of the drugs. In *Castro*, the defendant alleged and the police admitted that the informant was present at the time and place of a drug transaction. In *Roviaro*, the informant sought to be produced was the purchaser of the narcotics from the defendant. In the instant case, the record discloses no evidence that Grant ever knew or spoke to Crose, and Grant simply was not a participant in or a witness to the crime with which Crose was charged.

We also find without merit Crose's "entrapment defense" argument. He contends that he could not determine Grant's precise relevance to a possible entrapment defense without the opportunity to interview her and, moreover, that he was entitled to decide, and not the government, whether to call Grant or to interview her in preparation for trial. In support thereof, Crose relies on *People v. Coleman* (1984), 124 Ill. App. 3d 597. In *Coleman*, the State refused to dis-

close the identity of an informant who had acted in a dual role as a tipster and material witness of the defendant's alleged drug activities. The State suggested that the court conduct an *in camera* interview of him to determine whether his testimony would be helpful to the defense. The trial court ruled, and this court affirmed, that to grant the State's request "would infringe on the duty of defense counsel to decide on the strategy most advantageous to his client and to make tactical decisions accordingly." 124 Ill. App. 3d at 601.

■■ ■ We first observe in the instant case, however, that, as discussed above, Grant was not involved in the crime with which defendant was charged and she was neither a tipster nor witness as admittedly the informant was in *Coleman*. We also note that in order to raise the defense of entrapment, a defendant must present "some" evidence thereon, before the burden shifts to the State to prove, in addition to the elements of the offense, the absence of entrapment beyond a reasonable doubt. (*People v. Raess* (1986), 146 Ill. App. 3d 384.) Here, defense counsel presented no specific reasons as to why the trial court should order Grant's production; he merely alleged that "it [she] would have something to do with the entrapment defense" and he inquired whether Grant had a criminal record. In addition, defense counsel made no claim that Grant did anything to induce Crose to commit the offense with which he was charged. In other words, defense counsel offered only speculation for the court's consideration, which clearly was insufficient "evidence" requiring the production of Grant. (See *People v. Thornton* (1984), 125 Ill. App. 3d 316 (notwithstanding the fact that an informant participated in the first of three drug transactions between the defendant and a police officer, the defendant's argument that the informant might possess knowledge relevant to a defense of entrapment concerning the third transaction with which the defendant was charged and at which the informant was not present was speculation and insufficient to require production of the informant).) In summary, defendant failed to present any scintilla of evidence to rebut the State's explanation to the court that Grant was not involved in the drug transaction for which defendant was charged. Accordingly, we hold that the trial court properly denied defendant's motion for production of Grant.

Crose next argues that he was denied effective assistance of counsel because his attorney allegedly failed to advise him concerning his decision to testify and admitted his guilt in arguing to the court that he "assisted" Tatman in the delivery of the cocaine. The State asserts that Crose's counsel's strategy was competent under the circumstances; he focused on attacking the chain of custody of the al-

leged cocaine and on minimizing Crose's role in the transaction.

In order to show ineffective assistance of counsel, a defendant must show that his counsel's performance was deficient and that the deficient performance prejudiced him (*Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052), such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" (466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068). Strategic choices made after thorough investigation of the law and facts relevant to plausible options are virtually unchallengable. 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052.

Here, Crose first argues that no conceivable strategy supported his counsel's decision to put him on the stand, especially for purposes of merely minimizing his culpability, where the State's case against him was based on an accountability theory. In so doing, Crose asserts that his counsel demonstrated a complete ignorance of the principle of accountability. We find this contention without merit. The evidence presented by the State alone overwhelmingly implicated Crose in the transaction, *i.e.*, Agent Cavalenes' testimony, which was corroborated by Agent Shappaugh and Officer Zardock. Under these circumstances we therefore cannot say that Crose's counsel's advice to him to take the stand does not qualify as a strategic decision, albeit to minimize his culpability.

We further disagree with Crose's contention that "only two defenses made sense that [he] did not lend assistance at all, or that any help he rendered was not for the purpose of facilitating the offense," since the State merely showed that he played a part in the events leading up to the delivery and not that he assisted in the commission of the offense with a *conscious objective or purpose* to facilitate the offense. Based on the facts, this contention is also completely without merit. In other words, Crose is claiming that he did what he did without any conscious/intentional objective to facilitate the delivery of cocaine from Garza to Tatman or the agents; he did not intentionally or consciously intend to meet with Tatman for the purpose of taking him and the agents to Garza in order for them to purchase cocaine. Based on the record before us, there could be no other explanation for Crose's conduct; it is completely ludicrous to suggest that Crose merely happened to meet Tatman in the parking lot and that he directed the agents and Tatman to Garza's home for any other purpose, especially since he testified he had knowledge that the parties involved wanted to purchase some cocaine.

For the foregoing reasons, we also find Crose's argument

without merit that his counsel prejudiced him by arguing his assistance in the transaction in order to minimize his culpability. The only strategy available to defense counsel under the circumstances, besides challenging the chain of custody of the cocaine, was to so argue. Specifically, the statements complained of in support of his argument were that his counsel, in closing, argued that he "was just there in order to assist Tatman. *** He assisted Tatman in getting over there to Garza's"; that he merely made an introduction and gave directions to Garza's but never touched any money or cocaine; that he was not in the room when the alleged delivery took place; and that he was not to receive any benefit from the alleged transaction. Crose contends that these "points" were irrelevant if he in fact intentionally assisted in a delivery of cocaine and thus counsel ignored the principle of accountability. We disagree; these points do not unequivocally admit of anything contrary to what Crose himself testified to concerning his involvement. See *People v. Chandler* (1989), 129 Ill. 2d 233.

■ We also find the circumstances here distinguishable from *People v. Hattery* (1985), 109 Ill. 2d 449, upon which Crose relies. In *Hattery*, defense counsel in his opening statement told the jury that " '[a]t the end of your deliberations, you will find [the defendant] guilty of murder.' " (109 Ill. 2d at 458.) The *Hattery* court reversed the defendant's conviction, holding that the statement was an unequivocal concession of the defendant's guilt and that counsel failed to advance any theory of defense. Here, Crose's counsel's strategy was to attack the chain of custody of the cocaine in the case presented by the State. Once Crose's case was presented and the evidence against him was overwhelmingly established, counsel attempted to minimize his role. While this tactic is concededly debatable (see *People v. Hinton* (1987), 163 Ill. App. 3d 227), we cannot say that it rose to the level of an unequivocal admission of his guilt. Similarly, unlike *Hattery*, defense counsel here, by attacking the chain of custody of the cocaine, subjected the prosecution's case to a meaningful adversarial testing (see *People v. Chandler* (1989), 129 Ill. 2d 233). Thus, defense counsel presented more than a mitigating theory in defense of Crose.

■ We further observe, assuming *arguendo* that counsel conceded Crose's guilt, that "*Hattery* did not hold that it is *per se* ineffectiveness of counsel whenever an attorney concedes his client's guilt to offenses and the record fails to show the client's consent, if there is overwhelming evidence of that guilt" (*People v. Chandler* (1989), 129 Ill. 2d 233, 246, citing *People v. Johnson* (1989), 128 Ill.

2d 253). "[I]f a concession of guilt is made, ineffectiveness may be established; however, the defendant faces a high burden before he can forsake the two-part *Strickland* test." (129 Ill. 2d at 246.) The *Strickland* test requires that a defendant not only must show that his counsel's performance was deficient and that the deficient performance prejudiced him, but also that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland v. Washington* (1984), 466 U.S. 668, 694, 80 L. Ed. 2d 674, 698, 104 S. Ct. 2052, 2068.) Based on the record before us, we cannot say that the trial court would have reached a different verdict, absent the *alleged* unprofessional errors of Crose's counsel.

Finally, we observe that defense counsel's last words to the court, after arguing that the State's chain of custody of the cocaine was deficient and there was insufficient evidence to support Crose's conviction, were: "We respectfully request the court to find Jody Crose not guilty of the charges made against him." Clearly, defense counsel was not conceding defendant's guilt.

Crose's last argument that the trial court erred in allowing the State's "chemist" to testify as an expert will be discussed below, since Crose has adopted Garza's argument regarding this issue.

## II

■■ ■ Defendant Garza argues on appeal that he was denied effective assistance of counsel because his counsel failed to seek a severance of his case from that of Crose based on the claim that their defenses were antagonistic, the trial court erred in admitting the hearsay testimony of Agent Cavalenes as a coconspirator exception to the hearsay rule, and the court erred in allowing the State's "chemist" to testify as an expert witness. With respect to Garza's first argument, we observe that, generally, jointly indicted defendants should be tried jointly unless their defenses are inconsistent, antagonistic or general principles of fairness require otherwise. (*People v. Bean* (1985), 109 Ill. 2d 80.) A defendant who does not wish to be jointly tried may file a motion for severance (Ill. Rev. Stat. 1985, ch. 38, par. 114—8) and, where the motion is based on a claim of antagonistic defenses between himself and a codefendant, the defendant seeking the severance must make a specific showing of antagonism, including a detailed recitation of what his defense would be; mere apprehension of prejudice is not enough. *People v. Bean* (1985), 109 Ill. 2d 80.

■■ In the instant case, we do not find any antagonism between

Garza's and Crose's defenses or that, as Garza also appears to argue, their defenses were inconsistent requiring a severance, based on his assertion that his testimony conflicted drastically with the testimony given by Crose. Specifically, as Garza points out in his appellate brief, Crose's defense was that he "did not receive any benefit by the transaction. Mr. Garza's counsel argued that the evidence did not show a delivery to Cavalenes, that she only had it for a moment before Tatman got it back. Mr. Garza never testified that he had an agreement to deliver anything to Cavalenes." Garza states that these defenses conflict in a material way in that he did not deliver anything to Cavalenes, yet Crose "pointed a finger at him" by testifying that he was Garza's "connect." Our review of the record, however, reveals that Crose did not testify that he saw Garza hand the cocaine to Agent Cavalenes. In fact, Crose testified that he did not observe Garza deliver any substances to the agent because he was outside of the kitchen when the alleged delivery occurred. Moreover, although Crose testified that he was the "connect" and intermediary between Tatman and the agents, such an admission is not the equivalent of a statement that he actually saw Garza deliver the cocaine to Cavalenes or that he was to sell her anything. Since we find that Garza's and Crose's defenses were not antagonistic or inconsistent, a severance motion by Garza would have been a futile act and the motion disallowed (see *People v. Zambetta* (1985), 132 Ill. App. 3d 740). Accordingly, Garza's contention of ineffective assistance of counsel is without merit.

We also reject Garza's argument that the trial court erred in allowing the hearsay testimony of Agent Cavalenes based on the co-conspirator exception to the hearsay rule. The statement at issue was made to investigating officers by a woman named Kathy, whom the agents met at an address where they were supposed to meet Tatman prior to their actual meeting with him. Kathy stated that she had just received a telephone call from Tatman and that he would be back shortly. Upon objection by both defendants' counsel, the State contended that the statement was not offered for the truth of the matter asserted, and the court recognized that the statement would account only for the investigators' future actions or conversations.

 █ We agree with the trial court's ruling. It is well settled that statements which would be hearsay if offered for the truth of the matter asserted therein may be admissible if offered for the limited purpose of explaining why the police conducted their investigation as they did. (*People v. Sanchez* (1987), 163 Ill. App. 3d 186.) We further observe that Garza's contention that the statement was of-

fered to show a large conspiracy and to inflame the trier of fact thereby is also without merit. As the State points out, although the trial court discussed the coconspirator hearsay exception, it did so before hearing the testimony and before the prosecutor specifically stated that it was not being offered for the truth of the matter asserted. Moreover, assuming admission of the statement had been error, the statement simply had no bearing whatsoever on the outcome of Garza's case; there is no reasonable possibility that the verdict would have been different had the hearsay been excluded. See *People v. Clark* (1987), 160 Ill. App. 3d 877.

Garza's final argument, as well as Crose's, concerns the testimony of the State's forensic scientist or, as referred to by defendants, the State's "chemist," Lynn Pora. Both defendants contend that the trial court erred in finding her qualified to testify as an expert witness.

 The record discloses that Pora is employed by the Illinois Department of State Police, Bureau of Forensic Service and Identification. She worked as a scientist for five years. She has a bachelor's of arts degree in biology with a minor degree in chemistry. Upon her hiring she participated in a one-year intensive training program with the department. She is a member of two professional societies and has attended various seminars. She has presented two papers at the Midwest Association of Science meetings, and the State police laboratory in which she works is certified and accredited by the American Society of Lab Directors. She had analyzed controlled substances several thousand times and had specifically tested for cocaine about 2,500 times prior to 1985. Defendants' objections to Pora's qualifications appear to be based simply on the fact that the one-year training program she took in 1982 and 1983 was not at a lab certified by the Illinois Department of Public Health and that she could not remember the number of credits or the amount of chemistry courses she took to obtain her bachelor's degree. Accordingly, defendants contend that the trial court abused its discretion in allowing Pora to testify as an expert. In support thereof, they cite two cases which simply are inapplicable to the situation before us. In those cases the courts allowed individuals to testify as experts in areas outside of their profession and where they lacked sufficient training and experience. (See *People v. Fiorita* (1930), 339 Ill. 78; *People v. Owens* (1987), 155 Ill. App. 3d 990.) Here, Pora had worked in the field as a forensic scientist for five years and had additional education and training as discussed above. This matter was within the trial court's discretion as to whether her education, training and employment

qualified her as an expert, which our statute defines as a person "who, because of education, training or experience, possesses knowledge of a specialized nature beyond that of the average person on a factual matter material to a claim or defense." (107 Ill. 2d R. 220(a)(1).) We see no reason to disturb the trial court's determination that Pora's qualifications comport with the statutory definition of an expert.

In light of the foregoing, we affirm the convictions of both defendants.

Affirmed.

COCCIA, P.J., and LORENZ, J., concur.